Whitaker, Judge,
delivered the opinion of the court:
This controversy has been referred to us by House Kesolution No. 385 of the 85th Congress, 1st Session, with a request *625 for a report, “giving findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable against the United States, and the amount, if any, legally or equitably owing by the United States to the claimant.”
As required by our rules, plaintiff duly filed its petition asserting its claim. The gravamen of its complaint is stated in paragraph 17 of its petition which reads:
That directly due to the wrongful and arbitrary refusal of the General Services Administration to release said dormant estate without the payment of additional consideration, which was a violation and breach of the aforesaid Contract of Sale, plaintiff was forced to make a compromise settlement of its suit for specific performance against Mast-Foos Manufacturing Company and Federal Land Company.
■ Defendant answered, denying the alleged obligation to release the dormant estate without consideration, and denying further that its refusal to do so forced plaintiff to compromise its law suit. It accordingly denied liability for the loss plaintiff allegedly suffered.
We referred the case to Commissioner S. R. Gamer for a report of the facts and for his recommendation for a conclusion of law. He has made a detailed report of the facts, which we have adopted, and he has supported his recommendation for a conclusion of law by an opinion, in which we concur. The Commissioner, however, expressed no opinion on the obligation of the defendant to release the dormant estate without consideration. We agree with him that even if there was such an obligation, plaintiff has not shown that the refusal to do so was the cause of the loss of which it complains. In the ordinary case, this would make unnecessary a discussion of the obligation to release it, but, since this is a reference by Congress, and Congress may want to know what our opinion is on this question, we state it briefly.
The disposal of surplus war property was in the hands of the War Assets Administration, whose functions were later taken over by the General Services Administration; but the National Industrial Reserve Act of 1948 (62 Stat. 1225) vested in the Secretary of Defense the discretion of placing certain property in a national industrial reserve, which would *626 be available in time of a national emergency. In section 4(2) it authorized the Secretary of Defense to adopt “a national security clause” to be inserted in deeds to or leases of government-owned property whenever the Secretary thought this necessary for the national defense. In section 4(3) the Secretary was authorized to “consent to the relinquishment or waiver of all or any part of any national security clause * * * when it is determined that the retention of the productive capacity of any such excess industrial property is no longer essential to the national security * *
Accordingly, the terms of the sale of Plancor 76 was in the hands of the War Assets Administration, except that it was required to insert in the deed the national security clause prescribed by the Secretary of Defense. Such a clause was inserted. It is set out in detail in section 7, subparagraphs A to P. Subparagraphs B, C, and D read:
B. A dormant estate for a period of twenty years is reserved by the Government, which dormant estate may be activated for one or more periods not exceeding five years duration each. At the completion of the twentieth year, the Purchaser will have clear and complete title.
C. The Purchaser, or the Secretary (as hereinafter defined) may at any time cause a re-examination of the necessity for continuing the dormant estate upon the plant or any portion thereof. Such estate may be discontinued at any time during the twenty-year period when the Secretary determines such action consistent with the national defense interests of the United States.
D. The dormant estate may be activated by the Secretary at any time prior to the expiration of the twenty-year period, by written instructions to the Purchaser, whenever, in the opinion of the Secreary, considerations of national defense so require. In the event the dormant estate is so activated, the Government shall have the right to full possession and use of the plant.
On September 10,1954, the Assistant Secretary of Defense wrote the Administrator of the General Services Administration, which had taken over the duties of the War Assets Administration, in part, as follows:
*627 A review of the properties listed below and disposed of subject to a National Security Clause reveals that their retention in the National Industrial Eeserve is no longer justified.
*****
Aviation Corp., Detroit, Michigan, DoD No. 178 [Plancor 76]
In accordance with the authority delegated to this office by the Secretary of Defense and in accordance with the provisions of Public Law 883, 80th Congress, you are hereby notified that these properties have been removed from the National Industrial Eeserve.
It is suggested that if any of these plants were disposed of at less than fair value due to the inclusion of the security clause, that removal of the clause from the sales documents be made subject to such terms and conditions as you consider to the best advantage of the Government.
The determination of the Secretary of Defense that this property was no longer necessary in the national defense made quite remote the possibility that the dormant estate would ever be reactivated, but we suppose that possibility was not completely foreclosed until the dormant estate was formally relinquished, because, although removed from the national reserve, there was nothing to prevent its later restoration to that reserve, so long as the dormant estate was in existence.
Plaintiff, however, says that the determination of the Secretary of Defense that it was no longer necessary for the national defense to hold this property in reserve, obligated the General Services Administration to formally release the dormant estate without consideration.
We do not think so. When plaintiff’s predecessor in title purchased Plancor 76, it did not purchase the fee simple, the full legal title to the property. From the fee, the Government carved out what it termed the dormant estate and sold only the remainder. The monetary consideration that it received for this transfer was, of course, paid only for the interest which it conveyed. The dormant estate was not conveyed, and we must assume that plaintiff’s predecessor paid less for what it did receive than it would have paid if it had been able to acquire the fee simple, without any reservation by the United States.
*628 The National Industrial Keserve Act recognized in section 5 that the reservation of these estates would make more difficult the disposition of surplus property, from which it follows that the consideration for it would be less. In the case of this particular piece of property it was appraised at $383,276 without the reservation, and $344,948 with the reservation. Plaintiff paid less than the lower figure, but it stands to reason it would have been willing to pay more without the reservation. The vigorous complaint plaintiff now makes of the refusal to release the estate reserved, and the heavy damage they say was caused by the refusal to do so, demonstrates that this is so.
Now the deed had nothing to say about whether or not further consideration should be paid for a release of the reserved estate, leaving that, apparently, to negotiation by the parties at the time the release of the reservation was requested. This being true, it seems to us that the General Services Administration was within its rights in demanding a consideration for the release of the reserved estate. This estate was not conveyed at the time the deed was executed; the consideration paid did not include it, and it need not now be conveyed without the payment of consideration.
But, even though the General Services Administration was obligated to release this estate, it certainly was not obligated to do so within 60 days or any other definite time, as plaintiff’s purchaser asserted. For this reason, but more particularly for the reasons set forth by the Commissioner in his opinion, we are of opinion that plaintiff has not shown that the refusal to release the estate was the cause of the loss it alleges.
In our opinion plaintiff is not entitled to judgment, nor is it equitably entitled to recover. Its petition will be dismissed.
This opinion, together with the Commissioner’s opinion and findings will be reported to the House of Bepresentatives in accordance with the resolution set out above.
It is so ordered.
Laramore, Judge; Madden, Judge; and Jones, Chief Judge, concur.
*629 OPINION OP THE COMMISSIONER
This claim against the United States arose as a collateral matter to a controversy plaintiff had with a third party. Plaintiff contends it incurred losses of approximately $100,000 by being obliged to settle certain litigation it instituted against the third party which would not have been incurred had defendant, after the commencement of the litigation, fulfilled certain alleged contractual obligations to plaintiff. It asserts legal liability against defendant, under the court’s general jurisdiction, for damages arising out of an alleged breach of plaintiff’s contract with defendant, for which it seeks judgment. It alternatively prays that the court report to Congress in accordance with House Resolution 385, 85th Congress, 1st Session, adopted August 22, 1957, which referred a proposed bill for plaintiff’s relief to this court under 28 U.S.C. § 1492 and § 2509 for report concerning “The nature and character of the demand, as a claim legal or equitable against the United States.” The Resolution and the proposed bill are set forth in finding 1.
In addition to other property, plaintiff owned a parcel of land of approximately 3 acres, with a plant thereon, which it had purchased from the Government. The facility was originally built during the war by Defense Plant Corporation, a subsidiary of the Reconstruction Finance Corporation, and, under the designation of Plancor 76, was used for war purposes. After the war, it was declared to be surplus. The facility directly adjoined plaintiff’s factory and property comprising 9 acres, and plaintiff first leased and then purchased it, using it in conjunction with its business of truck manufacturing. The purchase agreement between plaintiff and the Government provided, by a so-called National Security Clause, that for 20 years the Government would have the right, in the event of a national emergency, to take over and reactivate the facility. The interest retained by the Government in Plancor 76 was referred to 'as a “dormant estate”, and the contract of sale spelled out in detail the incidents and scope of such estate, (finding 11 (b)). Various restrictions were placed upon the use of the property while it was so maintained in the na *630 tion’s so-called “industrial reserve”, and the property could not be sold without the Government’s consent. It was also required that the contract effecting the transfer from the Government to plaintiff be recorded so that effective public notice would be given of the existence of the dormant estate on, and the Government’s retained interest in, the property.
Some 6 years later, plaintiff sold its entire truck business, including Plancor 76, to interests owned or controlled by one Winslow, for $1,375,000. The sale was effectuated by two sets of documents. One, covering all the property but Plancor 76, was made effective immediately, with over $890,000 in cash being paid in connection with their execution, plus certain notes to become due in the future. The other, covering Plancor 76, provided among other things that the deed thereto was to be held until the Government’s consent to the sale of the facility was secured and recorded, at which time a Winslow note for $250,000 would become due and payable. Plaintiff was given 60 days within which to obtain such consent, after which the Winslow interests would have the option of terminating their obligation to purchase Plancor 76. The Winslow interests were also to assume the outstanding unpaid balance on plaintiff’s mortgage to the Government, amounting to almost $108,000. However, the Winslow interests immediately moved into possession of and commenced operating the entire business, including Plancor 76. During this transition period in the business, plaintiff paid various expenses for and on behalf of Winslow, and Winslow in turn paid some accounts that were plaintiff’s responsibility. The parties treated these mutual payments as an open account to be later liquidated.
Plaintiff failed to procure and record the Government’s formal consent to the sale of Plancor 76 within 60 days. Immediately upon the expiration of such period, Winslow exercised his option to refuse to purchase it. Within a few days thereafter, plaintiff received the consent and promptly thereafter recorded it, but by that time the Winslow interests had abandoned Plancor 76, and plaintiff was obliged to reas-sume possession of it, thereafter paying the taxes on it and otherwise maintaining it. At that time Winslow owed plaintiff over $23,500 on the open account.
*631 Plaintiff then instituted a suit in the Ohio courts for specific performance against the Winslow interests. Believing that Winslow’s defense would center upon plaintiff’s late obtaining of the Government’s consent to the sale, plaintiff investigated and was informed by the Government that Winslow himself was responsible for part of the delay, since Winslow had not promptly supplied the Government with certain financial statements which the Government required before issuing its approval for Winslow’s assumption of ownership.
However, the answers filed by the Winslow interests in July 1955 contained several defenses, including a counterclaim against plaintiff for almost $300,000, being Winslow’s alleged loss on Plancor 76 by reason of plaintiff’s default. In addition to the defense of plaintiff’s late procuring of the Government’s consent, the answers claimed that it was also plaintiff’s obligation, under a proper interpretation of the sale documents, as well as under certain oral representations and understandings, to obtain the Government’s consent to a release of the dormant estate within the 60-day period, as well as a consent to the sale. Winslow argued that without such release, plaintiff could not deliver a warranty deed conveying good and marketable title, as was its obligation under the contract of sale. Other defenses included an alleged absence of consideration to support certain of the sale documents, and the contention that the requested relief of specific performance should be denied because there was an adequate remedy at law.
Plaintiff was allegedly astonished by the defense relating to the dormant estate. It felt that there was no misunderstanding whatsoever that Winslow was taking title subject to the dormant estate and that the sale documents, as it interpreted them, clearly so provided. It categorically denied making any contrary representations or there being any contrary understanding. Nevertheless, to strengthen its litigating position, plaintiff decided to ascertain what could then be done to obtain a release of the dormant estate. It was of the belief that, under the existing conditions, including the changes in the ownership and uses of the surrounding properties and the absence of any equipment in *632 Plancor 76, it could never be reactivated for the same uses to which it had been put during the war and that the estate should therefore be of no value or interest to the Government. Investigation also revealed that over a year earlier, on September 10, 1954, the Secretary of Defense had in fact determined that the plant was no longer required in the Industrial Eeserve and had authorized the General Services Administration, the agency vested with jurisdiction over the property aspects of surplus war plants as well as dormant estates thereon, to release the dormant estate “subject to such terms and conditions as” it considered “to the best advantage of the Government.”
However, upon inquiry by plaintiff in October 1955, GSA advised that, in accordance with general policy and procedure, plaintiff would, to obtain a release, be obliged to pay a consideration therefor approximately equal to the amount by which the value of the property was, at the time plaintiff purchased it, depreciated by reason of the existence of the dormant estate, less an adjustment based upon the length of time that the estate had already run. GSA stated that the Government’s appraisals at the time plaintiff purchased the property some 7 years ago showed that its value had then been depreciated by 10 percent, or approximately $30,000, because of the imposition of the estate, so that the consideration for the release should be approximately that amount, less an adjustment for the 7 of the 20 years that the estate had already run. Plaintiff had paid $300,000 for Plancor 76. Plaintiff refused to pay any amount for the release based on such a formula, contending that it was entitled to a release without any consideration whatsoever, not only because the estate was then, in its opinion, of no value to the Government, but because, as it interpreted the National Security Clause in its contract with the Government, it was, without additional consideration, entitled to such a release if the Secretary of Defense removed the plant from the Eeserve. The Government contested this interpretation of the contract, concluding it would result in a windfall to plaintiff, and refused to issue a release upon plaintiff’s terms and demands.
Meanwhile, plaintiff was endeavoring to find another purchaser for the plant, believing that such a sale would assist *633 in the disposition of the litigation and would also serve to minimize the damages, since maintenance expenses were heavy and the plant was standing idle. An interested prospect was found who was willing to purchase Plancor 76 subject to the dormant estate at what plaintiff believed was an excellent price considering that real estate values were then in a declining period, and in connection with working out the sale, which required the cooperation of both plaintiff and Winslow, since each claimed the title to the property was in the other, settlement discussions took place. Finally, a settlement was worked out. The Winslow interests completed the purchase of the property from plaintiff, and in turn conveyed it to the new purchaser. However, the unpaid balance of the original contract purchase price of $1,375,000 was adjusted so that, in cash and notes, plaintiff received some $16,000 less, according to defendant’s calculation, and some $28,000 less, according to plaintiff’s. In addition, plaintiff made other concessions. It gave up the $23,500 balance due on the open account. It also abandoned its claim for the sums it expended in maintaining the property from the time it reassumed possession in September 1954 after Winslow abandoned it. Up to the date of execution of the settlement agreement in February 1956, this amount totaled over $20,000. All of these losses, plus interest at 6 percent on them, total $100,215, the amount herein claimed.
Many factors entered into plaintiff’s decision to settle its litigation with Winslow. They included practical business reasons, as well as recognition of the hazards incident to the litigation. As to the former, plaintiff realized that the value of real estate in Detroit, where Plancor 76 was located, was falling and, if it lost the suit, it would be left with a less valuable parcel of real estate on its hands than was presented by the offer of the new purchaser, which could be used to pay the balance owed by Winslow. Indeed, plaintiff thought the amount the newly found purchaser was willing to pay exceeded the then market price of the property. The condition of the court calendar was such that the case could not be resolved for approximately 2 years, not calculating additional time for appeals, and the property was costing considerable money to carry, while not *634 producing any income. Even if plaintiff won its suit, it had no way of knowing what the credit of the Winslow interests would be years later and whether they would then be able to satisfy the judgment, so that even a successful litigation result might nevertheless not avert ultimate losses. And as to the litigation hazards, plaintiff had no assurance that it would be successful in the suit. While it honestly believed there was no merit to Winslow’s defense concerning the dormant estate, it realized that Winslow had successfully raised questions of fact with respect to it, and no one could tell what the result of a trial would be. Furthermore, even if plaintiff prevailed on this issue, there were the other defenses which still had to be met, especially the defense that plaintiff had not obtained the Government’s consent to the sale within the agreed 60-day period, with the parties specifically agreeing that, in such event, Wins-low could withdraw. Plaintiff also realized that the relief of specific performance which it sought might not be granted. And, in light of the counterclaim, there was always the possibility that the litigation might ultimately be concluded with a judgment outstanding against plaintiff.
Based upon this recital of the essential facts, plaintiff’s contention that it was the refusal of GSA to issue, without consideration, a release of the dormant estate in October 1955 that caused it to settle its suit against Winslow in February 1956 at a loss of approximately $100,000, and that such refusal, which plaintiff charges constituted a breach of contract, was therefore the proximate cause of the loss, cannot be accepted. It is not supported by the record. It presupposes that had plaintiff, at that late date, being over a year after Winslow’s disclaimer based upon the expiration of the 60-day period, confronted Winslow with a release, Winslow would have been left defenseless and would have had no alternative but to pay plaintiff the full balance of the original contract price plus the other items herein claimed. But such an assumption — basic to plaintiff’s contention — cannot be made. This is necessarily so because even if Winslow were at that time still obliged to accept the release, there were, in addition to this dormant estate issue, other defenses, including the defense that, regardless of the dormant estate, plaintiff had failed to obtain GSA’s *635 consent to the sale within the agreed 60-day period. Plaintiff waives this, as well as all the other defenses, aside, maintaining that the defense relating to the dormant estate was really the only serions defense Winslow was making and the one about which all the others revolved, and that the Government could have dissipated that one by issuing a release thereof. But such a contention would oblige this court’s undertaking either to attempt to resolve the merits of plaintiff’s complicated lawsuit with the Winslow interests, or to reconstruct the settlement negotiations and attempt to arrive at a conclusion of how much better plaintiff’s bargaining position would have been had it then had a recordable release. This the court could not possibly do on the basis of this record. Indeed, plaintiff itself so recognizes by admitting in its testimony in this case that even if it had been able to present Winslow with a release of the dormant estate, there was no assurance that it would still not be faced with the other defenses, and that the failure to procure the release may have affected the settlement only “in part.” (Transcript of testimony, pp. 90-92; 112.) The litigation therefore might well have continued, and the identical settlement concluded, in any event.
Under these circumstances, it cannot he found that it was the failure of GSA to release the dormant estate that was the proximate cause of plaintiff’s losses. And without such a finding, there can be no legal liability imposed on defendant. The plain fact of the matter is that, even accepting plaintiff’s own version of its troubles with Winslow, it was Winslow who caused plaintiff’s loss, and not the Government, and that there is no convincing showing that the Government’s issuance of the release would have made the slightest difference in the settlement that plaintiff ultimately elected to conclude with Winslow. And, on the other hand, if Winslow’s account, as set forth in his defenses, is accepted, then it was plaintiff who was at fault and it itself is responsible for its own losses. In neither event is plaintiff entitled to shift these losses to the Government.
Actually, it is no longer possible, in light of the compromise, for any court now to evaluate the various Winslow defenses, or to conclude what would have happened if one of them were overcome. Had plaintiff not settled and the *636 Ohio courts agreed with plaintiff’s judgment that Winslow’s defenses were devoid of merit, the losses here claimed would have been averted (assuming the Winslow interests were financially able to satisfy the judgment). Thus, accepting plaintiff’s statements as to the validity of its legal position, the losses were due to plaintiff’s voluntary settlement entered into for various practical reasons. However, plaintiff does admit, as set forth above, that the hazards of litigation and the possibility of losing the suit also played a part in its decision to settle.
Nor can plaintiff argue that, after the removal of Plancor 76 from the Reserve, any release of the estate by GSA earlier than October 1955 would have made any difference. The plant was not removed from the Reserve until September 10, 1951. Winslow took the action that led to the litigation on August 30,1954. Plaintiff’s difficulties with Winslow therefore had already materialized by the time the removal took place. Thus, even if plaintiff is correct in its contention that once the Secretary of Defense removes a plant from the Industrial Reserve, GSA thereafter has only the ministerial duty of releasing the dormant estate without consideration, it would make no difference in this case, because by the time of the Secretary’s removal action, plaintiff was already embroiled in its difficulties with Winslow. Actually, however, plaintiff’s first demand upon GSA for the release came in October 1955, shortly after Winslow’s answers were filed and when plaintiff for the first time learned, to its alleged surprise, that there was any dormant estate issue at all between itself and Winslow. As shown, at that late date, it is not demonstrated that the issuance of the release would have had any effect in eliminating or minimizing plaintiff’s losses in its dealings with Winslow. Such a lack of showing prevents recovery. As this court stated in Myerle, Exr., v. The United States, 33 Ct. Cl. 1, 27, in language peculiarly applicable to the instant situation:
We hold that the plaintiff can only recover those items of damage which are the proximate result of the acts of the Government. * * * For a damage to be direct there must appear no intervening incident (not caused by the defaulting party) to complicate or confuse the certainty of the result between the cause and the dam *637 age; the cause must produce the effect inevitably and naturally, not possibly nor even probably. The damage must be such as was to have been foreseen by the parties, who are assumed to have considered the situation, the contract, and the usual course of events; but eliminated from this consideration must be any condition of affairs peculiar to the contractor individually in the particular case and not of general application under similar conditions. There must not be two steps between cause and damage. * * *
And as the court in Osage Oil & Refining Co. v. Chandler, 287 F. 848, 852 (C.C.A. 2d), similarly stated:
* * * the loss for which a recovery may be had in an action against a wrongdoer must be the result of the wrong inflicted. The party complaining must show, not only that he has suffered the loss, but also that it would not have been incurred, but for the wrongful act of his adversary; * * *.
In this connection, it should be noted that, under GSA’s formula, a release of the dormant estate might well have been obtained at the time for approximately $20,000.[1] It seems strange indeed that plaintiff should have imposed a $100,000 loss on itself rather than pay the $20,000. Plaintiff’s only explanation is that it preferred to accept the larger loss rather than to pay any sum whatsoever to GSA when it was convinced GSA was in error. This explanation is hardly consistent with traditional legal principles pertaining to proximate cause or the duty to minimize damages. If there was in fact such a direct causal connection between the release and plaintiff’s suit with Winslow, and plaintiff could have won its suit simply by paying the Government $20,000, it should have paid it under protest, thereby not suffering any losses from Winslow, and then sued in this court to recover the $20,000. Cf. Clapp v. United States, 127 Ct. Cl. 505, cert. den. 348 U.S. 834. If it were then sustained in its contention that it was entitled to a release without consideration, it would have come out whole.
*638 The conclusion, that defendant’s refusal to issue a recordable release without consideration in October 1955 was not the proximate cause of plaintiff’s losses necessarily requires a dismissal of plaintiff’s petition without the necessity of deciding in this case the legal question raised by plaintiff as to whether, when the Secretary of Defense removes a plant from the Industrial Reserve, GSA thereafter, under the form of National Security Clause used in the instant contract, has only the ministerial duty to perform of issuing a recordable release of the dormant estate, and has no power to negotiate for what it considers to be fair consideration for the release of the Government’s interests in the realty.
It also makes unnecessary a decision on plaintiff’s contention that, even if GSA would be entitled to negotiate for such consideration, in this particular case the consideration should properly be zero, and that GSA’s demand for any consideration was therefore unjustified. However, one argument made by plaintiff in support of this position is certainly without merit. Plaintiff relies on the fact that during the war, Plancor 76 was used for the manufacture of aircraft parts as part of a common operation with an adjoining factory. Since such adjoining factory was sold to a company engaged in an entirely different manufacturing operation, and the properties are now being separately operated by different owners, with all the old aircraft manufacturing machines removed from Plancor 76, plaintiff argues that Plancor 76 was an isolated parcel of realty with poor ingress and egress and no street frontage, and could no longer be employed for the purpose for which it had been used during the war, thus rendering the dormant estate in fact valueless. However, there is nothing in the National Security Clause used in the instant contract or in the National Industrial Reserve Act of 1948 (62 Stat. 1225) authorizing the Secretary of Defense to create a National Industrial Reserve and to formulate a National Security Clause to effectuate the objectives of the Reserve, which so restricts the Government’s use in the event of reactivation. Under the Clause, it seems plain that the dormant estate could be reactivated for any purpose required by the national defense, and the record shows that, despite the re *639 moval of the wartime manufacturing machinery, the plant is capable of reactivation for national defense purposes in the event of an emergency.
For the same reason that plaintiff has no legal cause of action, it has no equitable claim, for there is no equity in having the Government pay losses it did not cause but which, instead, plaintiff voluntarily imposed upon itself in disposing of litigation with which it became involved with a third party.
It is accordingly recommended that plaintiff’s petition, insofar as it asserts a claim under the general jurisdiction of this court, be dismissed and that the House of Eepre-sentatives be informed that plaintiff has no legal or equitable claim against the United States.
FINDINGS OF FACT
1. House Eesolution 385 of the 85th Congress, 1st Session, agreed to by the House of Eepresentatives on August 22, 1957, pursuant to 28 U.S.C. §§ 1492 and 2509, is as follows:
Resolved\ That the bill (H.E. 8500) entitled “A bill for the relief of the Fawick Corporation,” together with all accompanying papers, is hereby referred to United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections, and report to the House of Eepresentatives at the earliest practicable date, giving findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable against the United States, and the amount, if any, legally or equitably owing by the United States to the claimant.
House Bill H.E. 8500 referred to in the aforesaid House Eesolution No. 385 is as follows:
A BILL
For the relief of the Fawick Corporation.
Be it enacted, by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury be, and he is hereby, authorized and directed to pay, out of any *640 money in the Treasury not otherwise appropriated, the sum of $105,000 to the Fawick Corporation, of Cleveland, Ohio. Such sum represents the amount allegedly due from the United States to the said Fawick Corporation by reason of damages sustained by the said corporation resulting from the arbitrary refusal of the General Services Administration to issue in a timely manner a recordable release of a national security clause, in connection with the consummation of a sale of Plancor Numbered 76: Provided, That no part of the amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.
The petition herein was filed pursuant to said Resolution and also under the general jurisdiction of this court.
2. Plaintiff was incorporated in 1910 under the laws of the State of Michigan, with the name “The Federal Motor Truck Company”, and from then until June 30, 1954, was engaged in the business of manufacturing, assembling and selling motor trucks, called Federal Motor Trucks, as well as related vehicles and spare parts therefor. As of October 31, 1952, The Fawick Airflex Company, Inc., an Indiana corporation, was merged with and into plaintiff, with plaintiff being the continuing corporation under the name of Federal Fawick Corporation. After this merger, plaintiff’s operations were conducted in three divisions: (1) the Fa-wick Airflex Division, in Cleveland, Ohio; (2) the Federal Motor Truck Division, in Detroit, Michigan; and (3) the Fawick Brake Division, also in Detroit. After the assets of the Federal Motor Truck Division were disposed of on June 30, 1954, as will hereinafter be set forth, plaintiff’s name was changed to “Fawick Corporation”. Plaintiff will hereinafter be referred to as such regardless of the name it happened to bear at any particular time. Since its organization in 1910, plaintiff carried on its motor truck operations in a factory located at 5780 Federal Avenue, Detroit.
*641 3. In. 1942, Defense Plant Corporation (DPC), a subsidiary of Eeconstruction Finance Corporation (EFC), acquired certain industrial property in Detroit, Michigan, consisting of 3.16 acres, and shaped like the figure 7. The east side joined plaintiff’s factory on Federal Avenue, and was separated only by a railroad siding which served the property. The extreme southern part of the area joined property owned in 1942 by the Aviation Corporation, which, like plaintiff’s property, also fronted on Federal Avenue. The long vertical west side of the property bordered a 20-foot public alley. The northern boundary of the property joined the Michigan Central Eailroad tracks.
4. After the acquisition of the property, DPC constructed several buildings thereon. The largest was a manufacturing building on the long vertical part which, at the south end, joined and formed a common property wall with a building used by the Eepublic Aircraft Products Division of Aviation Corporation. This building consisted of a basement and ground floor with a 100-foot balcony at the south end. The total floor area was 64,308 square feet. It had concrete foundations and floors throughout, sill-high brick exterior walls with steel sash above, a steel roof deck, and insulated and built-up slag roofing. There was fluorescent lighting, as well as skylights located over all machine rooms. There was also a steel storage building on the northeast comer of the property, which was a 3,340-square foot one-story building with concrete foundation and floors, a steel roof deck, and insulated and built-up slag roofing. There was also a 14,000-square foot heat-treatment building located at the extreme west end of the property, consisting of a one-story steel-frame concrete block structure, with concrete foundations and floors, composition roofing on a wood deck, and steel sash above the sill line. In addition, there was a so-called chip house, consisting of a one-story frame building with concrete floor, having a floor area of 2,585 square feet. Finally, there was a storage building, consisting of a one-story frame structure with concrete foundation and floor slab, having a total area of 550 square feet. The property and the various buildings thereon as described were *642 designated by DPC as “Plancor 76”, and will be hereinafter so referred to.
5. During World War II Plancor 76 was used by the Republic Aircraft Products Division of Aviation Corporation in conjunction with its privately owned building as a complete facility in the manufacture of aircraft engine parts. An access-way was opened in the common wall between the main Plancor 76 building and the privately owned building of Aviation Corporation, and manufacturing was carried on as a unit in both buildings. During this time, Plancor 76 was equipped by defendant with several million dollars’ worth of small electrically powered machines and elaborate installations of electric power lines and bus bars.
6. Although the privately owned building of Aviation Corporation fronted on Federal Avenue, as did plaintiff’s factory, the main Plancor 76 building, located to the rear of the Aviation Corporation building, fronted on no street, and the only access thereto was by means of the 20-foot public alley. It was extremely difficult for trucks to service the main Plancor 76 building without damaging private property abutting on the alley.
7. In late 1945, Aviation Corporation’s use of Plancor 76 ceased and the facility was declared surplus on March 22, 1946. All machinery and equipment were removed from the property by defendant, leaving nothing but the buildings themselves. Aviation Corporation sold its privately owned building theretofore used by its Republic Aircraft Products Division (which had a common wall with the main Plancor 76 building) to shareholders of the Brown Bedding Company, who thereafter used the building for operations of the Sealy Mattress Company.
8. In late 1945 and early 1946, defendant attempted to sell Plancor 76, but no suitable offer was received. The only offer was submitted by plaintiff in the amount of $211,000 but this was considered to be inadequate and was not accepted. Since the property was adjacent to plaintiff’s factory site, plaintiff was interested in it, but its lack of street frontage restricted its appeal to others. On May 17, 1946, plaintiff leased Plancor 76 from defendant for a consideration of $36,500 annually, no machinery or equipment being *643 included in the lease. The term of the lease, as subsequently extended, was for five years, commencing from June 7, 1946. At this time, the opening between the main building of Plancor 76 and the former building of Aviation Corporation which had existed in the common wall between them was bricked up.
The main Plancor 76 building was used by plaintiff for the operation of its service department, i.e., the storing, packaging, shipping and selling of replacement parts for Federal Motor trucks. The 14,000-square foot concrete block building was used by plaintiff as its experimental department, and the 3,340-square foot building was used for storage purposes.
9. In 1948, defendant again attempted to sell Plancor 76. In connection therewith, an appraisal of the property was made by defendant as of July 2, 1948, which disclosed a fair market value of $383,276 for the property. It was also determined that the imposition of the National Security Clause, or a so-called dormant estate upon the property, the terms of which are hereinafter set forth, would, in the event of a sale, depress the value of Plancor 76 by 10 percent. Such an estate, which gave the defense departments certain future rights of use of the property in the event of another national emergency, was placed on certain properties which had been used by defendant during the war for war manufacturing purposes but which were being disposed of as surplus. The fair market value of Plancor 76 subject to such clause or estate was therefore determined to be $344,948.
10. In 1948, during the period of the lease, plaintiff and defendant entered into negotiations for the sale of Plancor 76 to plaintiff. On October 4, 1948, plaintiff addressed a letter to defendant making an offer to purchase Plancor 76 for $300,000. On October 6, 1948, a supplementary letter was sent by plaintiff to defendant, which confirmed:
* * * that our offer of purchase of Plancor 76 also includes the application of the National Security clause in the agreement.
Under date of October 18, 1948, the War Assets Administration (WAA) sent a letter to plaintiff setting forth the *644 terms of the contract of sale which would be acceptable to the defendant, including, among other things, that the conveyance should be subject to the National Security Clause. This letter was approved and endorsed by plaintiff’s president on November 5, 1948, and returned to WAA. Thereafter, a contract of sale was entered into under date of April 28, 1949, between plaintiff and NFC, acting by and through the War Assets Administrator, which provided that the conveyance should be effective as of November 5, 1948.
11. (a) The contract of sale provided in part, as follows:
Whereas, the Seller, with the advice and upon the recommendation of the Army and Navy Munitions Board, has determined that the Facility, as now constituted, is a war reserve plant of vital interest to the Government of the United States (hereinafter called the “Government”) in time of emergency, and that it is imperative, in the interests of the national security, that its potential productive capacity be preserved for a period of not less than twenty (20) years after the effective date of this agreement; and
Whereas, the Purchaser has accordingly offered, as further consideration for the sale and conveyance and transfer of the Facility to it, to preserve, to the extent and upon the terms and conditions hereinafter expressed, the potential productive capacity of the Facility ; and
Whereas, the Seller, with the approval of the Munitions Board and other interested agencies of the Government, has accepted the offer of Purchaser for the Facility, but desires to reserve for the benefit of the Government a “dormant estate” (as hereinafter defined) , in the Facility, which may be 'activated in the manner, and upon the terms and conditions hereinafter expressed and provided:
Now, therefore, in consideration of the premises and the mutual covenants and undertakings herein contained, and with due recognition of the importance of the Facility to national security, it is agreed by and between the parties hereto as follows: * * *.
(&) Insofar as the issues herein involved are concerned, there were two primary limitations imposed on the purchaser in the contract. The first is referred to as the National Security Clause, contained in Section II of the contract. It provided:
*645 Seven : For the purpose of this Section II, the terms “Facility” and “plant” shall mean one and the same thing, i.e., the land, buildings, building installations, land improvements and related personal property comprising the property covered by this Contract of Sale and more particularly described and referred to in Section I, paragraph one hereof, together with such improvements, replacements or repairs thereto as may be required on the part of Purchaser hereunder to maintain and preserve the present potential productive capacity and ability of the Facility, and it is agreed that the sale of the Facility shall be and the same is hereby made subject to the National Security Clause and the provisions of same applicable to this sale are hereby agreed upon as follows:
a. The Facility is considered a war reserve plant and as such will be of vital interest to the nation in time of emergency.
b. A dormant estate for a period of twenty years is reserved by the Government, which dormant estate may be activated for one or more periods not exceeding five years duration each. At the completion of the twentieth year, the Purchaser will have clear and complete title.
o. The Purchaser, or the Secretary (as hereinafter defined) may at any time cause a re-examination of the necessity for continuing the dormant estate upon the plant or any portion thereof. Such estate may be discontinued at any time during the twenty-year period when the Secretary determines such 'action consistent with the national defense interests of the United States.
d. The dormant estate may be activated by the Secretary at any time prior to the expiration of the twenty year period, by written instructions to the Purchaser, whenever, in the opinion of the Secretary, considerations of national defense so require. In the event the dormant estate is so activated, the Government shall have the right to full possession and use of the plant.
e. When, in the opinion of the Secretary, it becomes necessary for the Government to utilize the productive capacity of the plant for purposes of national defense, the Government will undertake to negotiate a satisfactory contract with the Purchaser provided such Purchaser is, in the opinion of the Secretary, qualified to perform the work desired. In the event a mutually satisfactory contract cannot be negotiated with the Purchaser within a period of fifteen days the Government may proceed to activate the dormant estate.
*646 p. The Purchaser, upon receipt of written notice that the dormant estate has been activated, will immediately proceed to remove improvements, fixtures, alterations, machinery and other equipment, in accordance with the directions and instructions in such notice. Such action will be completed in the shortest possible time but in no case in excess of 120 days from the date written notice is received. Thereafter, the Purchaser will immediately vacate and peaceably surrender possession of the plant to the Government and will permit the Government to have the use of such easements and rights of way over and upon the property of the Purchaser as may be necessary or convenient for the operation of the plant.
g. In the event the dormant estate is activated, the Government will pay to the Purchaser:
(a) Seasonable costs and expenses in connection with restoring the plant to its condition at the time of sale or in performing other work, to the extent required by directions and instructions received from the appropriate Secretary.
(b) Seasonable costs of re-installing the Purchaser’s machinery, equipment and improvements when possession of the plant by the Government is relinquished to the Purchaser.
(c) Fair compensation for loss incurred on work in process in the plant which cannot be completed due to the activation of the dormant estate.
The Government will not compensate the Purchaser for losses and damages other than herein provided.
h. During the period or periods that the dormant estate is activated, the Government will pay the Purchaser compensation at a rate to be fixed by the Secretary which rate shall not be in excess of the prevailing normal rental for similar industrial properties.
i. During the twenty-year period, the Purchaser will not, without the written consent of the Secretary, make alterations to the structure of the buildings and will not move or alter any non-severabla building installation or land improvements, which alterations will impair or diminish the capacity, existing 'at the time of sale, of the Facility to produce the items for which it was designed unless restoration can be made within a period of 120 days or less, or unless other facilities determined by the Secretary to have equivalent productive capacity are made available and are made subject to all provisions of this National Security Clause, including the extension thereto of a dormant estate in the *647 Government therein, by modification of this contract in writing.
J. The Purchaser will not, without the written consent of the Secretary, remove, sell or dispose of any of the equipment in the plant and belonging to the Government at the time of sale, the loss of which would materially reduce the capacity of the Facility to produce the items for which it was designed, during the period of maintenance specified in paragraph (k) unless replacement is made by equivalent equipment.
k. The Purchaser will maintain all lands, structures, appurtenances and related personal property now in or appurtenant to the plant and belonging to the Government at the time of salej throughout the periods specified below, in such condition that the plant can be put into efficient operation for its intended defense use in the shortest possible time but in no case in excess of 120 days: Provided, however, that the Purchaser shall not be obligated hereunder to retain or replace the Facility after the expiration of the period of maintenance here-inbelow specified.

Period of Faoility Maintenance

(a) Lands; permanent structures and appurte- 20 years nanees (Main structural frame of metal, concrete or masonry).
(b) Timber structures and their appurtenances_15 years
n. The Secretary shall have the right to conduct an inspection or survey of the plant at any time, subject to prior written notice thereof to the Purchaser.
m. When, in the opinion of the Secretary, the Purchaser fails to comply with the obligations imposed upon it hereunder, the Government shall have the right to take full possession of the plant and to take such action as may be necessary to remedy the Purchaser’s default. All costs incident to taking possession of the plant under these circumstances and of the work performed or action taken under the direction of the Government, shall be borne by the Purchaser. Upon completion of such work, possession of the plant will be returned to the Purchaser unless the dormant estate is activated in the interim.
N. In the event the plant is destroyed or otherwise substantially damaged prior to the expiration of the twenty-year period, the Secretary will review the necessity for retaining the dormant estate. In the event it is determined by the Secretary that the dormant estate no longer need be retained in the interest of national defense, a quitclaim deed will be given to the Purchaser.
*648 o. As used in this agreement the term “Secretary” shall be deemed to refer either to the Secretary of the Army, the Secretary of the Navy or the Secretary of the Air Force, and to their respective duly appointed representatives, depending upon which of said Departments had jurisdiction and control over the plant prior to its declaration as surplus, or to such of said three Secretaries as may have been designated by the Munitions Board. The term “Purchaser” shall be deemed to refer to the Purchaser hereunder, its successors, assigns and any subsequent transferee or transferees of the plant. The term “plant” refers to the property sold, conveyed and transferred hereunder and to any part or portion thereof.
p. The Purchaser shall cause this agreement to be duly and properly recorded so as to put third persons upon notice of the Government’s interest in the plant hereunder and shall furnish evidence of such recordation to War Assets Administration.
(c) The second limitation on the conveyance made to the plaintiff related to securing consent for the resale of the property. Paragraph 14 of the contract provided:
Fourteen : Purchaser has certified and hereby agrees, for itself, its successors and assigns, that:
(a) It is acquiring the property herein contracted to be purchased for its own use.
(b) It is not acquiring the property for the purpose of reselling it.
(c) In no case will it resell said real property within twenty (20) years from the date of the Quitclaim Deed aforesaid, without first obtaining the written authorization of the War Assets Administrator, or his successor in office.
(d) The contract was recorded in the Register of Deeds office of Wayne County, Michigan.
12. A quitclaim deed dated April 28, 1949, executed by RFC, acting by and through the War Assets Administrator, and recorded in the land records of Wayne County, Michigan, was delivered to plaintiff, which provided, among other things:
The party of the second part, the Grantee herein, has certified and by the acceptance of this Deed agrees for itself, its successors and assigns, that this conveyance is made pursuant to that certain Contract of Sale be *649 tween the parties, dated April 28, 1949, and especially with regard to the provisions of the National Security Clause therein stated and the dormant estate therein defined. Pursuant to said Contract of Sale, Grantor, for itself and the United States of America, hereby reserves and excepts from this conveyance said dormant estate, and Grantee, for itself, its successors, grantees and assigns, agrees that its covenants and agreements with respect to said dormant estate shall constitute covenants running with the land.
The Grantee herein has certified and by the acceptance of this Deed agrees for itself, its successors and assigns, as follows:
1. That it is acquiring the said real estate for its own use.
2. That it is not purchasing said real estate for the purpose of reselling or leasing it.
3. That in no case will it resell the real estate within twenty (20) years_ from the date of this indenture, without first obtaining the written authorization of the War Assets Administrator.
13. The National Security Clause contained in the contract of sale between RFC and plaintiff was not a standard clause but was specifically written for the contract. Subsequently, in February 1950, the Defense Department published a standard National Industrial Reserve Clause. This standard clause contains the following provision:
* * * Provided, however, that the Government, at its own election, or upon a petition by the grantee, may reconsider the necessity for continuing all or any part of the clause in effect, and shall, in the event it determines such necessity no longer exists, and upon tender by the grantee of whatever consideration may be requested, revoke the clause, in whole or in part, by executing and delivering to the grantee a release, quitclaim deed, or whatever instrument is necessary to remove the encumbrance of the clause, or of a part thereof, from the facilities. * * *
14. As a part of the purchase price, plaintiff gave its promissory note for $240,000, payable in installments over a 10-year period, secured by a mortgage on Plancor 76, the mortgage being to General Services Administration (GSA), which succeeded to the interests of WAA.
*650 15. After the purchase of Plancor 76, plaintiff used the property for the same purposes as while leasing the property. As long as plaintiff so used Plancor 76, the existence of the dormant estate was not considered to be burdensome by the company. Plaintiff did not contemplate any use of the property requiring heavy machinery, and in any event considered the likelihood of the Government’s exercising its rights under the dormant estate as remote. However, plaintiff’s officers realized they could not make unlimited or unrestricted alterations or use of the property, such as putting in heavy presses requiring subfoundations.
The original land of the Federal Motor Truck Division, plus the newly acquired Plancor 76, totaled 12 acres.
16. In the spring of 1954, plaintiff decided to dispose of its Federal Motor Truck Division and by agreement dated June 22, 1954, plaintiff sold substantially all of the assets of said Division located both in Detroit, (including Plancor 76) and in New York City, to a corporation called the Mast-Foos Manufacturing Company. This corporation was owned and controlled by one Dallas E. Winslow, its president, who also owned and controlled another corporation, the Jansson Precision Gage Company, and who with his wife were partners in another business entity which bore the identical name as the corporation first above mentioned, i.e., Mast-Foos Manufacturing Company. It was understood at the time of the negotiations with Winslow and the sale to the Mast-Foos corporation that the property would in turn be transferred to Jansson Precision Gage Company. The price agreed upon was a lump sum of $1,375,000 to cover the 12 acres of land and buildings comprising the Division in Detroit, and personal property of the Division located both in Detroit and New York City, including machinery, office and factory equipment, inventory, tools, dies, jigs, engineering data, finished goods, work in process, a certain patent, the right to the names “Federal” and “Federal Motor Truck”, and the parts and service business of the Division. The contract also provided that Mast-Foos would fulfill certain contracts the Division had with the United States for the delivery of spare and replacement parts for trucks, and further set forth a schedule of payments.
*651 17. In relation to the land which plaintiff agreed to convey, paragraph 10 of the contract provided:
10. Federal Fawick represents and warrants that it has good and marketable title to all of the assets to be transferred herennder and that same are free from all liens and encumbrances, excepting only the lien of current real estate taxes and assessments not due or payable and zoning ordinances, easements and restrictions of record, if any, and the mortgage to General Services Administration which is hereinabove referred to and assumed by Mast-Foos.
18. Under date of June 80, 1954, a supplemental agreement was entered into between plaintiff and the Mast-Foos corporation which, among other things, amended paragraph 10 of the contract, referred to above, to read as follows:
10. Federal Fawick represents and warrants that it has good and marketable title to all of the assets to be transferred hereunder and that same are free from all liens and encumbrances, excepting the lien of current real estate taxes and assessments not due or payable and zoning ordinances, easements and restrictions of record, if any, and the mortgage to United States of America which is hereinabove referred to and assumed by Mast-Foos, and a dormant estate reserved by the United States of America in that parcel of property acquired by Federal Fawick in conveyance recorded in Liber 9776, Page 277, Deeds, Wayne County Records.
On the date of closing, Federal Fawick shall deliver to Mast-Foos, or assigns, a warranty deed to that parcel of property acquired from the United States of America (and recorded in Liber 9776, Page 277, Deeds, Wayne County Records) but Mast-Foos, or assigns, shall not file said deed in the deed records of Wayne County until a written consent of War Assets Administrator, or other proper officer of the United States Government, to the sale of said property is filed in the Recorder’s Office of Wayne County.
19. Also on June 30,1954, the Mast-Foos corporation, by its president, Winslow, assigned all of its rights and obligations under the contract of sale to Jansson Precision Gage Company, also acting by its president, Winslow. In the assignment, the purchase price of $1,375,000 was broken down and various amounts assigned to land and buildings, tools, inventory, etc. The amount allocated to land and *652 buildings was $773,000, which referred to the entire 12-acre tract sold, including Plancor 76. The assignment of value to the various components of the sale of the Federal Motor Truck Division was done by Winslow and his organizations for tax purposes and had no relation to the market value as such.
The obligations of both the Mast-Foos corporation and Jansson Precision Gage Company were guaranteed by the Mast-Foos partnership by an instrument of guaranty also executed on June 30,1954.
20. (a) Pursuant to the agreement and supplemental agreement, two deeds to the property were, on June 30, 1954, delivered by plaintiff to the Mast-Foos corporation. One deed covered the plant site of the Federal Motor Truck Division, exclusive of Plancor 76. The other deed related solely to Plancor 76. The deed to the plant site exclusive of Plancor 76 was recorded immediately. The deed to Plancor 76 was held for the purpose of securing the consent of GSA to the sale. Mast-Foos paid $50,000 on execution of the June 22, 1954, agreement and $842,100 on delivery of the deeds, making $892,100 paid in cash. Mast-Foos also delivered its promissory note for $250,000, payable upon recording of the consent of defendant to the sale of Plancor 76 to Mast-Foos or its assigns. In addition, it delivered two additional promissory notes for $62,500 each, payable on January 1,1956, and January 1,1957, respectively. The remaining part of the purchase price of $1,375,000 represented the balance of $107,900 remaining on the mortgage to GSA on Plancor 76, which Mast-Foos assumed.
Thus, the price of $1,375,000 was to be paid as follows:
$50,000 — on execution of the agreement;
842,100 — on delivery of the deeds;
250, 000 — promissory note, payable on recording of consent by defendant to the sale;
62, 500 — promissory note payable January 1,1956;
62, 500 — promissory note payable January 1,1957;
107,900 — balance of mortgage, assumed by purchaser.
$1, 375,000
(b) On the same day, June 30, 1954, plaintiff gave Jans-son a letter which read as follows:
*653 You have today delivered to us a note for $250,000 to be paid only upon the recording of a consent from the War Assets Administrator consenting to the sale by Federal Fawick Corporation to your company of certain parcels of land described in a deed recorded in Liber 9776, page 277, Deeds, Wayne County Records and we have delivered to you a Warranty Deed covering the same property which you are not to file until said consent has been filed.
It is now our understanding that we shall have sixty (60) days within which to procure such consent and thereafter you shall have the right and option at any time on written notice to terminate our agreement as to the purchase of these particular parcels of land. Upon receipt of such notice, you will forthwith deliver back to us the Warranty Deed covering said parcels and we will deliver back to you your promissory note, and you will be released from any liability under your Assumption of Mortgage to The United States of America dated June 30, 1954 and we will repay to you any payments made on said mortgage.
(c) The provision of the supplemental agreement of June 30, 1954, with respect to the payment of the $250,000 note was as follows:
The promissory note set forth in item (C) above shall be a demand note, wherein Mast-Foos and/or assigns shall promise to pay to Federal Fawick the sum of $250,000 upon there being filed in the Recorder’s Office, Wayne County, Michigan, written consent of the War Assets Administrator, or other proper officer of the United States Government, to the sale by Federal Fawick to Mast-Foos, or assigns, of that real property owned by Federal Fawick which was acquired from Reconstruction Finance Corporation by deed recorded in Liber 9776, Page 277, Deeds, Wayne Comity Records.
21. The Winslow group went into possession of both properties on July 1,1954, and commenced operating the business and properties formerly comprising plaintiff’s Federal Motor Truck Division, including Plancor 76. Jansson Precision Gage Company first changed its name to Federal Motor Truck Company and later to Federal Land Company, and as such undertook to supply parts for Federal Motor trucks. Plaintiff retained a small office space in the Federal *654 Motor plant site in connection with the completion of its contracts with the United States, and paid the new owners rent for the use of such space.
22. On July 2,1954, a letter was written to GSA advising it of the transfer of Plancor 76 and seeking the required consent of GSA to the sale.
23. The Chicago office of GSA was at the time vested with initial authority and responsibility with respect to Plancor 76. Early in July 1954, Winslow requested one of plaintiff’s attorneys to ascertain from GSA what would be required, if anything, to secure a release of the dormant estate. Winslow was willing to pay the balance of the mortgage in full to obtain such release. Thereupon a telephone call was made by plaintiff’s counsel from Detroit to the Chicago GSA office. Plaintiff’s counsel stated that he wanted to know what procedure would be required to secure a release of the National Security Clause and that, as an inducement to secure such a release, the purchaser would agree to liquidate the balance of the mortgage. The representatives of GSA stated that it would first have to be determined if the property was still required by the Government for the National Industrial Eeserve and, if not, the National Security Clause could be released upon the payment of an agreed upon consideration, which would be substantial, since it would have to be based on the amount by which the value of the property had been decreased, at the time plaintiff acquired it, by reason of the imposition of the estate for 20 years, but adjusted by the time that had already expired. A second telephone conversation was held on August 3, 1954, between the same parties in which GSA advised it would consent to have the property sold to Mast Foos and Jansson, but it would be necessary that plaintiff be left on the mortgage. This was disappointing to plaintiff’s counsel, who again asked to have the dormant estate released and again offered to pay the mortgage in full to obtain such release. However, GSA repeated that even if the Secretary of Defense concluded that Plancor 76 was no longer required for the Industrial Eeserve, plaintiff would nevertheless have to negotiate with GSA for the payment of an appropriate consideration for the release and that, as previously stated, the consideration for the release *655 would be required to be substantial, based upon the formula previously described. Plaintiff’s counsel stated that plaintiff would not agree to pay any such consideration because he believed that the dormant estate was no longer of any value to defendant since in his opinion the property could not be used again for the purposes for which it had been used by Aviation Corporation during the war in view of the sale of the Aviation Corporation’s plant, and in addition, since all the manufacturing equipment and heavy power lines had been removed from the property. Under those circumstances, plaintiff felt it was entitled to a release without the payment of any consideration.
24. On August 3,1954, GSA sent a letter to plaintiff stating that the transfer of the property to Mast-Foos would be satisfactory, but that GSA would not release plaintiff from its obligation on the mortgage.
25. In August 1954, Winslow, acting for the new owning corporation, began to sell the Federal Motor Truck plant site acquired from plaintiff. He first sold the northeasterly part known as the machine shop. On August 20, 1954, he held an auction and sold a large part of the machinery, equipment and personal property in the main plant. He sold the patents and good will to a Minnesota corporation called Northwest Auto Parts, which then changed its name to Federal Motor Truck Company. By the end of September 1954, all of the property and equipment acquired by the Winslow group had been disposed of and the buildings on Plancor 76 stood empty.
26. On August 30,1954, Winslow advised plaintiff in writing that he would not further perform the purchase agreements of June 22 and June 30, 1954, insofar as they involved the purchase of Plancor 76. His letter stated that plaintiff had not “procured and recorded with the Wayne County, Michigan Eegister, the consent of the War Assets Administrator or the General Services Administration to transfer from your company to ours of property described in the enclosed deed as required by our agreement dated June 30th.” He returned the deed to Plancor 76, requested that his agreement to assume the mortgage by GSA be returned and also that the promissory note of $250,000 be *656 canceled. Plaintiff assumed that Winslow had elected not to perform further the contract of purchase for Plancor 76 because plaintiff had not as yet secured a recordable consent to the sale of Plancor 76, the 60-day period specified in plaintiff’s letter of June 30,1954, set forth in finding 20(b), having passed.
Winslow abandoned the property in September 1954.
27. A formal, recordable consent by the defendant to the sale of Plancor 76 by the plaintiff to the Mast-Foos corporation and its assignee, Jansson Precision Gage Company, was received by plaintiff from GSA on September 1, 1954, and recorded on September 8,1954.
28. On September 10,1954, the Assistant Secretary of Defense sent the following letter to the Administrator of GSA:
A review of the properties listed below and disposed of subject to a National Security Clause reveals that their retention in the National Industrial Reserve is no longer justified.
$ ‡ $
Aviation Corp., Detroit, Michigan, DoD No. 178 [Plancor 76]
In accordance with the authority delegated to this office by the Secretary of Defense and in accordance with the provisions of Public Law 883, 80th Congress, you are hereby notified that these properties have been removed from the National Industrial Reserve.
It is suggested that if any of these plants were disposed of at less than fair value due to the inclusion of the security clause, that removal of the clause from the sales documents be made subject to such terms and conditions as you consider to the best advantage of the Government.
At this time plaintiff did not know of this action by the Department of Defense, nor was it so advised by GSA.
29. Plaintiff’s officers and attorneys conferred on what course of action to take as a result of Winslow’s refusal to accept the conveyance of Plancor 76. It was decided to bring a suit for specific performance of the agreements of June 22 and June 30, 1954, and such an action was filed in the Court of Common Pleas in Cuyahoga County, Ohio, on May 26, 1955, against both the Mast-Foos corporation and partnership.
*657 30. The Jansson company, -under its new name of Federal Land Company, as set forth in finding 21, by leave of court became a party defendant to plaintiff’s suit, and on July 15, 1955, both Federal Land and the Mast-Foos companies, the original defendants, filed their separate answers to plaintiff’s suit. Each answer contained six separate defenses. The defenses included the following: that the true interpretation of the agreement of June 22, 1954, and the supplemental agreement of June 30, 1954, as well as the understanding of the parties, was that plaintiff would convey title to Plancor 76 free and clear of the dormant estate, and that plaintiff’s obligation to secure the written consent of defendant was not limited to obtaining a consent to the sale of the property, but also included a consent to the release of the dormant estate, plaintiff, however, having failed to secure such a release of the dormant estate; that the supplemental agreement, the promissory note for $250,000, the guarantee by the partnership, and the additional agreement extending the closing date for 60 days as set forth in the letter of June 30, 1954, referred to in finding 20 (b), were entered into without consideration; and that in any event, since plaintiff had failed to obtain the Government’s consent to the transfer of the property within the agreed 60-day period, the election to terminate the agreement to purchase Plancor 76 on August 30, 1954, was therefore justified. In addition, Federal’s answer contained a cross-petition, in which Federal sought damages of $352,100 on the ground that, by reason of plaintiff’s failure to obtain the Government’s consents within the 60-day peroid provided by said letter of June 30, 1954, Federal was deprived of property having a reasonable market value, free of the dormant estate, of $710,000.
31. (a) After the filing of the answers, plaintiff’s counsel, on July 28, 1955, went to the GSA office in Chicago to ascertain why the consent to the sale had been so long in coming through. He was advised that the delay was not attributable to the Defense Department but was instead due to the delay by Mast-Foos in submitting certain financial statements which GSA had requested. Mast-Foos had written several letters to GSA requesting additional time to *658 furnish its financial statements. At this time, plaintiff’s counsel did not request a release of the dormant estate, the purpose of the trip being to investigate the defense that the consent to the sale had not been obtained within the 60-day period.
(5) On September 6, 1955, one of the plaintiff’s counsel went to Washington, D.C., to attempt to obtain a release of the dormant estate. While there, he learned that the Secretary of Defense had released Plancor 76 from the Industrial Reserve on September 10, 1954, as set forth in finding 28, and that it had been so reported to Congress on April 1, 1955, in an official report by the Secretary of Defense entitled “Seventh Annual Report to the Congress on the National Industrial Reserve Under Public Law 883, 80th Congress.” This was the first knowledge plaintiff had of the Defense Department’s action of September 10, 1954. Plaintiff then felt that the obtaining of a recordable release ought to be a mere formality and that GSA should not be seeking any consideration therefor.
32. On October 15, 1955, plaintiff filed its replies to the answers filed to its petition, in which it stated, among other things, that it was the parties’ intent at all times, as well as the proper interpretation of the agreement of June 22 and the supplemental agreement of June 30, 1954, that title was to be conveyed subject to the dormant estate and that at no time did plaintiff state or the parties understand that plaintiff would procure a release of the dormant estate, but that the only consent plaintiff was to obtain was a consent to the sale; that the supplemental agreement was in fact supported by consideration and that it was in any event valid under the laws of Michigan even without consideration; and that plaintiff’s obligation with respect to obtaining the Government’s consent to the sale was only to procure such consent as soon as possible after June 30, 1954, and impliedly within a reasonable time after the Winslow group furnished such cooperation as might reasonably be required by the Government; that the Winslow group was obligated to cooperate with the Government and furnish the Government with the necessary information about themselves to enable the Government to determine whether to consent to a sale of the property to them; that the Winslow group *659 failed to cooperate and timely supply tlie necessary information to the Government and in fact did not supply necessary information until August 30,1954, which was more than 60 days after June 30, 1954; that nevertheless, the Government had advised on August 31,1954, that it had consented to the sale, that formal consent was recorded on September 8, 1954, and that, under the circumstances, the Winslow group was estopped to contend that the consent was not timely filed.
33. In October 1955, plaintiff’s counsel, believing that, in light of the position taken in the litigation by the Winslow group, a release of the dormant estate even at this time would better plaintiff’s litigating position, and now knowing of the September 10, 1954, action of the Secretary of Defense, demanded of GSA a recordable release of the dormant estate without the payment of any consideration. However, the representatives of GSA advised plaintiff’s counsel of the appraisal of the property, referred to in finding 9, for $383,000 and the reduction of 10 percent, or $38,000, in the appraised valuation because of the imposition of the dormant estate. They stated that since they felt that plaintiff had secured the property at a considerable saving and reduction in price because of the inclusion of the National Security Clause, GSA would feel obliged to negotiate for the release of the dormant estate upon the payment of a consideration based approximately on 10 percent of the purchase price of $300,000, or $30,000, adjusted downward according to the passage of a portion of the 20-year period since it was originally imposed. Since approximately 7 of the 20 years had passed, a proportionate adjustment would reduce the figure by approximately one-third, or $10,000, making the adjusted figure approximately $20,000. Plaintiff’s counsel refused to agree to pay any consideration for the release, contending that since Plancor 76 had been determined to be no longer necessary to the national security, the Government was under the original contract of sale and quitclaim deed obligated to issue a release of the dormant estate without any consideration being paid therefor. However, GSA refused to issue a release upon such terms.
*660 34. Plaintiff and its counsel considered the defenses interposed by the Winslow group relating to the issue of the dormant estate to be wholly without merit. In addition, they considered the cross-petition, based upon a valuation of Plancor 76, without the dormant estate, of $710,000, to be ridiculous. They had no doubts whatsoever as to the true understanding of the parties, as disclosed by the agreements themselves and the discussions and conferences prior and subsequent thereto, that title to Plancor 76 was to be conveyed subject to the dormant estate, and that the only consent to be obtained from the Government was a consent to the transfer of title to Plancor 76 from plaintiff to the Winslow group. However, they recognized that, as a result of the position taken in the answers, as well as in depositions taken subsequent thereto, issues of fact had been raised concerning alleged oral representations and understandings between the parties which would have to be resolved by a trial and that the usual litigation hazards would necessarily be encountered in connection therewith.
35. (a) Following the conversations in October 1955 between plaintiff’s counsel and GSA officials in Chicago, as set forth in finding 33, the Chicago office of GSA, by letter of December 21, 1955, informed plaintiff that it had been authorized “to negotiate for a consideration the release of the National Security Clause now applicable to the property known as Plancor 76” and that “If you are desirous of the clause being released, please so inform us and we shall be glad to discuss with you the amount necessary to pay for the release.” On January 20, 1956, during negotiations between plaintiff and the Winslow group, it appeared that perhaps the litigation could be settled if the dormant estate were released. This came about as a result of an offer by a third party, Prestyle Manufacturing Company, to purchase Plancor 76 free of the dormant estate, which offer was transmitted to plaintiff by the attorneys for Winslow by letter of January 20, 1956, and which also set forth a proposal for settlement of the litigation if the Prestyle offer was accepted. On January 24, 1956, plaintiff’s counsel returned to Chicago and offered to pay $5,000 to GSA for the release of the dormant estate. This offer was rejected.
*661 (5) On January 28, 1956, plaintiff’s counsel sent GSA a letter which, stated in pertinent part:
* * * I am attorney for Fawick Corporation, formerly known as Federal Fawick Corporation, in an action against Mast-Foos Manufacturing Company et al., pending in the Court of Common Pleas of Cuyahoga County, Ohio, the court’s docket No. 672,143, and I conferred with you and Mr. Harold M. Kaufmann at Chicago on January 24 * * *. I had hoped to arrive at an amount that I might rationally recommend be paid by one party or another to said litigation, a matter to be worked out among them, notwithstanding my view that nothing should be expected as a consideration for a recordable release of the National Security Clause in the contract applicable to the property known as Plan-cor 76.
% * * *
In the “Seventh Annual Eeport to the Congress on the National Industrial Reserve, Under Public Law 883, 80th Congress” by the Secretary of Defense, dated April 1, 1955, it appears on page 19 as Item 72 that Plancor 76 had been “Removed from NIR” as “No longer required for national defense.” My information is that the Department of Defense had formally advised the General Services Administration under date of September 10, 1954 to the foregoing effect and had therein stated in substance (I do not know the exact wording) that the General Services Administration might try to collect any amount that might be or become due by reason of said removal of the Facility from the National Industrial Reserve.
In view of the foregoing, I contended in our conference and continue to maintain that as a matter of contract law the owner of Plancor 76 premises is entitled without further money consideration to a recordable release of the so-called “dormant estate” and all implementations of it. The lump sum “aggregate purchase price” was for the whole bundle of benefits promised to the Purchaser, including freedom from the National Security Clause if the Secretary of Defense in performance of his duty should make such a determination as he has in fact made. The remark in the letter from the Department of Defense that GSA might proceed to collect anything due was an idle caveat since the Contract of Sale did not arrange for any specific or calculable addition to the purchase price in such an eventuality. I further maintained and continue to *662 maintain that even if an owner of the premises were under some necessity of paying for such a recordable release, the fair value thereof to the Government in existing circumstances is nil. It seems to me that your approach to “the amount necessary to pay for the release” (quotation from your said letter of December 21, 1955 to Mr. Ruddon) was completely unjustifiable, and based upon erroneous theory and wrongful policy.
Assuming from the wording of your letter that the Government would prefer to have some money in its treasury rather than have a terminated and dead restriction which had run seven of its original potential twenty years and which before or after September 10, 1954 constituted at most a naked and bare cloud on title, and solely in the interest of facilitating disposition of the above mentioned pending litigation, I agreed to recommend that one party or another to the litigation pay $5,000 plus the balance due on the mortgage for (1) release or assignment of the mortgage as the payor might request and (2) a recordable release of all reservations by the United States or any department or agency of interests or rights under said Contract of Sale dated April 28, 1949 and of all reservations of rights in the quitclaim deed of the same date except those pursuant to Executive Order 9908. This last should be included in the release if and as soon as any officer has authority so to do. You brushed my offer to make such recommendation aside. Since you did not immediately agree that you would recommend acceptance of such an offer, I withdraw the offer and revert to my contention and position that such recordable release of the so-called dormant estate or National Security Clause and all implementations should be voluntarily tendered without further consideration.
As aforesaid, the dormant estate has been released by the Secretary of Defense and, as a matter of law, it no longer exists. Only the evidence of its release has not been made to appear in the records of Wayne County, Michigan. On behalf of Fawick Corporation, demand is hereby made for such a recordable release without further money consideration, and notice is hereby given that General Services Administration or the United States may be held accountable for expenses and any losses resulting from the delay in furnishing such a release as was justly due long ago as matter of contractual obligation and public duty.
*663 (o) By letter of February 2, 1956, to plaintiff’s counsel, the Chicago office of GSA replied to said letter of January 28,1956, as follows:
Your letter dated January 28,1956, addressed to Mr. Jos. A. Burke, makes demand for a recordable release of the dormant estate (National Security Clause) without further money consideration from Fawick Corporation.
We respectfully differ with your opinion as to the applicable law. The purchase price of $300,000.00 for Plancor 76 was, as you put it, “* * * for the whole bundle of benefits promised to the purchaser * * and the subjection of the property to the provisions and restrictions of the National Security Clause. We agree that the purchaser is entitled to obtain freedom from the restrictions of the National Security Clause if the Secretary of Defense should make the determination that such action is consistent with the national defense interests of the United States, but we do not agree (as a matter of law) that the purchaser is entitled to such freedom without a consideration passing to the Government. This is substantiated by the fact that the Secretary of Defense, in his letter addressed to this Administration advising that the property was removed from the National Industrial Reserve, suggested that the removal of the clause be made subject to terms and conditions this Administration should consider to be to the best interest of the Government.
_ This Administration requires that a reasonable consideration be paid for the execution of a release of the National Security Clause. We have examined the contract of sale dated April 28, 1949 between the Reconstruction Finance Corporation, acting by and through the War Assets Administration, and the Federal Motor .Truck Company, and find no provision for a release of the dormant estate (National Security Clause) without a consideration being paid therefor.
In our opinion paragraph seven c is permissive. It permits the Purchaser or the Secretary to cause a re-examination to be made of the necessity for continuing the dormant estate upon the property or any portion thereof, and authorizes the discontinuance at any time during the 20-year period when the Secretary determines such action consistent with the national defense interests of the United States. It does not provide that upon such a determination the Secretary will forthwith issue a release, or cause such a release to be issued, with *664 out the payment of any consideration therefor. We do not consider paragraph seveN N to be applicable since the property has neither been destroyed nor substantially damaged.
Therefore, we cannot accede to your demand for a recordable release to be issued and delivered to your client, Fawick Corporation, in the absence of payment to this Administration of a reasonable consideration.
(d) Plaintiff’s counsel had also forwarded copies of his letter of January 28, 1956, to the Administrator and the General Counsel of GSA in Washington, and requested consideration by them of his position, and a reply. By letter of June 22, 1956, the General Counsel of GSA replied in part as follows:
We are unable to agree that removal of the plant by the Secretary of Defense from the category of those required to be maintained as a part of the National Industrial Beserve entitles the Fawick Corporation to demand and receive without payment of consideration a recordable document evidencing the release of the dormant estate reserved in the deed by which Fawick’s gredecessor in title acquired the property from the rovernment.
The action of the Secretary of Defense affected certain internal operations, but it did not and was not intended to result in advantages to purchasers of the property which were not provided for by contract. Evidence of this is the suggestion made by the Secretary of Defense to this Administration that removal of the clause be made subject to terms and conditions considered in the best interest of the Government.
It is our position that the authority of this Administration to execute and deliver a release of the dormant estate without payment of an adequate consideration must be based upon an express agreement between the parties, or upon some provision of Public Law 883, 80th Congress, pursuant to which the clause was made applicable to the property.
The agreement of the parties, insofar as discontinuance of the dormant estate is concerned, is contained in paragraph Seven C of the Contract of Sale, which you quoted in your letter of January 28. That paragraph merely provides that the Secretary of Defense at his discretion may discontinue the dormant estate at any time during its term if he determines such action consistent with national defense. No contractual obliga *665 tion is imposed upon him to execute and deliver a recordable release to the purchaser of the property without payment of an adequate consideration even though such discretion is exercised.
Paragraph Seven N of the Contract of Sale, also quoted m part in your letter is obviously inapplicable since the property has not been destroyed or substantially damaged.
Public Law 883, 80th Congress, is silent with respect to any action which the Secretary is authorized or obligated to take upon request of a purchaser to provide evidence of the discontinuance of the dormant estate. Although there can be no doubt of the existence of implied authority in the Secretary to take such action, there is no support for the argument that such authority may be exercised to the advantage of the purchaser without payment of an adequate consideration to the Government.
As you are aware, the Government in appraising the property prior to the original sale determined upon an amount which it considered represented the decrease in the fair market value of the property by reason of the application of the National Security Clause. Your predecessor was thereby enabled to purchase the property for a lesser price than it could have if the property had been sold free of a National Security Clause. To now release the interest retained by the Government without requiring payment of an adequate consideration would result in a windfall to your client. In addition, your client would thus receive preferential treatment which has been consistently denied to other grantees of National Industrial property under similar circumstances.
Accordingly, we are obliged to deny your request for a recordable release to be executed and delivered without payment of consideration.
(e) The position taken by GSA with respect to Plancor 76 was in accordance with the established administrative practice that was and still is consistently applied. Whenever restrictions are imposed upon properties disposed of, and if the restriction is later sought to be removed, an attempt is made to ascertain what effect the restriction originally had upon the market value of the property, and a payment is then sought to adjust the value to what it would have been in the first place without the restriction, prorated, however, over the period of time yet remaining. GSA *666 treats the release of the restriction, or the release of a dormant estate, as a release of an interest in real estate which, like all other disposals of real estate or Government prop erty, necessitates the payment of consideration.
The Department of Defense is familiar with the GSA practice of refusing to grant a release unless a payment of what it considers to be reasonable consideration is made even though the Department has concluded that the plant is no longer required for the Industrial Deserve.
36. After Winslow served notice on August 30, 1954, that he elected not to perform further the agreement to purchase Plancor 76, as set forth in finding 26, and thereafter abandoned the property, plaintiff, in September 1954, again assumed possession. Thereafter, it paid the taxes on the property, defrayed the necessary maintenance expenses, including the securing of a guard for the property, and was able to lease the property to the Ford Motor Company for 6 months. Real estate agents in Detroit were advised that the property was for sale but that the conditions of any sale would have to be carefully handled because of the pending litigation. Plaintiff felt that if a purchaser could be found, it would serve to facilitate the disposition of the litigation.
37. As set forth in finding 35(a), Prestyle Manufacturing Company was interested in purchasing Plancor 76 and, through a real estate agent, first approached plaintiff with respect thereto. Plaintiff described the nature of the litigation with the Winslow group and suggested that Prestyle negotiate with Winslow. Prestyle did so, resulting in its offer to purchase Plancor 76 described in said finding, as well as the Winslow offer of compromise of the litigation, also referred to in said finding. By letter of January 28, 1956, plaintiff rejected Winslow’s January 20, 1956, offer of compromise based on the Prestyle offer of purchase, but suggested an alternative basis of settlement. Plaintiff urged that in any event efforts to sell Plancor 76 to Prestyle should continue even if all the issues between the parties to the litigation could not be settled at that time, but that the sale to Prestyle should be subject to the dormant estate. This suggestion was adopted 'and Prestyle ultimately was persuaded to purchase Plancor 76, subject to the dormant estate, for *667 $325,000. Since ths suit between plaintiff ¡and the Winslow group concerned the sale of Plancor 76, and the property was now being disposed of to Prestyle, such agreement of purchase continued to be the occasion for overall settlement discussions between plaintiff and the Winslow group ¡as to their differences. Such a settlement was finally worked out between the parties and embodied in a settlement agreement dated February 10, 1956. Pursuant thereto, Winslow agreed to take Plancor 76 subject to the dormant estate and Prestyle would in turn take the property from Winslow subject to the estate. It was agreed that the Winslow group would pay plaintiff $450,000, $437,500 in cash and $12,500 by a noninterest-bearing promissory note which would become due when the dormant estate would ultimately be released.[1] In addition (although not set forth in the settlement agreement itself) plaintiff ¡also received a note from Prestyle, which has since been paid, in the amount of $16,250. Thus, plaintiff received $453,750 in cash, plus the $12,500 note, or a total of $466,250 in cash and notes as a result of the settlement.
On August 30, 1954, when Winslow refused to perform further his agreement to purchase Plancor 76, there was due and owing on account of the total purchase price of $1,375,000 as set forth in finding 20(a), the sum of $482,900.[2] Thus, as a result of the settlement, plaintiff received $16,650 less by way of a total sales price in cash ¡and notes than it would have received under the original agreement with the Winslow group.
*668 38. In addition to the claim arising on the balance of the purchase price due and owing, for which, by the compromise, plaintiff accepted $16,650 less than originally contracted for, as set forth in finding 37, plaintiff had additional claims against the Winslow group which, under the compromise, it dropped. These claims were as follows:
(a) As set forth in finding 36, in September 1954, plaintiff reassumed possession of Plancor 76 and expended sums to maintain the property. The expenses of so maintaining Plancor 76 from September 1954 to February 10, 1956, the date of the settlement agreement, amounted to $20,129.67.
(5) During July and August 1954, while the Winslow group was in possession of and operating Plancor 76, it was a transition period in the Federal Motor truck business, and by agreement and informal arrangement between plaintiff and Winslow, plaintiff made certain payments for and on behalf of Winslow, and Winslow in turn made certain payments for and on behalf of plaintiff. These mutual payments were recognized as constituting an open and running account between the parties. At the time of the refusal by Winslow further to perform the agreement, the open account represented a balance due and owing by Winslow to plaintiff of $23,758.26.
(c) Interest at 6 percent on the amounts set forth in (a) and (5) from the dates of the incurrence of the indebted-nesses up to February 10,1956, as well as interest up to such date on the notes due under the original agreement but which were not paid when due because of Winslow’s failure to perform, amounted to $27,178.00.
The total of these three items, plus the $16,650 figure set forth in finding 37, all of which are claimed by plaintiff herein, is $87,715.93. In addition, plaintiff does not recognize the note of $12,500, referred to in finding 37, which it received as part of the settlement, as an item to be given consideration, since it is not expected to become due and payable for many years. It therefore adds such amount to said sum of $87,715.93, making a total of $100,215.93[3] *669 which it claims in this case as its total loss resulting from the settlement.
• 39. To carry out the settlement arrangements, plaintiff conveyed Plancor 76 to the Winslow group subject to the dormant estate, and the Winslow group in turn conveyed Plancor 76 to Prestyle subject to the dormant estate. When Prestyle took possession of Plancor 76, it converted the heat-treatment building to an office and removed the two wooden buildings referred to in finding 4 which were located in an area between Hammond Street and the main plant. After these changes were made it was possible to enter the plant site from Hammond Street, which afforded easier access to the plant than was theretofore afforded through the alley, as set forth in finding 6.
40. The fair market value of Plancor 76 as of 1954, subject to the National Security Clause, was $826,891.
41. Plaintiff contends that in July 1954, when plaintiff first inquired about a release of the dormant estate, Plancor 76, due to changes in its use and the use of surrounding properties, could not have been reactivated for the purposes for which it was used during World War II, that due to its location and inaccessibility, it was not practicable to reactivate Plancor 76 in July 1954 for any national security purposes, and that the dormant estate was of no value to the Government. The contention is not supported by the record. Plancor 76 could be reactivated for national defense uses and purposes. It is well located within the industrial area of Detroit. The electrically powered machines for producing small parts for aircraft engines and the electric power lines and bus bars could be replaced.
42. (a) The record fails to establish that, had plaintiff presented the Winslow interests with a release of the dormant estate after the dispute between plaintiff and Win-slow arose, Winslow would nevertheless not have relied on his other defenses and that the litigation would not have continued in any event. Similarly the record fails to establish that a presentation of such a release would have had any effect in producing a settlement that would have been *670 any more favorable to plaintiff, and if so, what the difference would have been. Therefore, it cannot be found that the failure to release the dormant estate was the proximate cause of the losses described in finding 38.
(b) As set forth in finding 34, plaintiff considered the Winslow defenses to be devoid of merit. Nevertheless, it decided to settle for practical business reasons as well as in recognition of the hazards incident to the litigation. The making of the settlement was influenced by the following factors:
Plaintiff felt it was fortunate in securing a purchaser for Plancor 76 at $325,000, which it considered a good price for the property, considering that at that time the value of real estate in Detroit was decreasing; as set forth in finding 34, there would be a trial of an issue of fact which could conceivably go against plaintiff and it was possible for plaintiff to end its litigation with a judgment against it; the relief requested of specific performance in equity might not be granted; the property was costing considerable money to carry; the case could not be resolved within a period of less than 2 years and a settlement would terminate further litigation expenses; it was possible that the credit of the Winslow group might decline by the time the litigation was concluded so that even a successful result in the litigation might not avert ultimate losses; and the existence of the defenses other than those relating to the dormant estate, especially the defense that GSA’s consent was not secured within the required 60-day time limit, presented problems.
(c) In agreeing to the settlement, and thereby incurring the loss of $87,715.93, or $100,215.93, plaintiff nevertheless knew that it could have obtained a release of the dormant estate for not more than $30,000, and probably for as little as $20,000, as set forth in finding 33.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and its petition is therefore dismissed.

 GSA claimed that -when plaintiff purchased the property in 1948, its market value was lowered by approximately $30,000 by reason of the imposition of the dormant estate. By 1955, approximately 7 years of the 20 had gone by. GSA was willing to make an adjustment for this lapsed: period1. A proportionate adjustment would have caused approximately, one-third to be deducted from the $30,000 figure, making the release figure approximately $20,000.

 Actually, because of plaintiff’s refusal to accept any further notes from the Winslow group, Prestyle agreed to taire the Winslow note and In turn gave plaintiff Its note based: on Identical terms. It was because this note was not due and payable until the dormant estate was released that plaintiff was still Interested in obtaining such a release even though the litigation had been settled and Prestyle was willing to purchase the property subject to the dormant estate. ¡For that reason, plaintiff, even after February 10, 1956, the date of the settlement, pressed the General Counsel of GSA for a reply to its letter of January 28, 1956, set forth in finding 35(b), which reply was given on June 22, 1956, as set forth in finding 35(d).

 Part of the purchase price under the original agreement included an assumption by the purchaser of the balance of the mortgage to the united States in the amount of $107,900 (finding 20(a)). As part of the settlement agreement, it was agreed that plaintiff would satisfy the mortgage, so that the $453,750 cash payment received by plaintiff in effect covered the payment of this balance. Plaintiff did in fact pay the mortgage balance to GSA In February 1956.

 This supplants the figure of $105,000 claimed In the petition.