SOUTH PUERTO RICO SUGAR COM-
PANY TRADING CORPORATION

v.

The UNITED STATES.

No. 378-61.

United States Court of Claims.

July 17, 1964.

Philip C. Scott, New York City, for plaintiff; Dewey, Ballantine, Bushby, Palmer & Wood, New York City, and Surrey, Karasik, Gould & Efron, Washington, D. C., of counsel.

Carl Eardley, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant. John G. Roberts, Washington, D. C., Raymond R. Robrecht, Jr., Atlanta, Ga., and David C. Katz, Pittsfield, Mass., were on the brief.

Before JONES, Senior Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

DAVIS, Judge.

In 1960 and 1961, plaintiff, a New York corporation, was required by the Government to pay some $6,900,000 as a precondition to the importation into this country of sugar from the Dominican Republic. These "entry fees" were imposed by an executive regulation issued under the Act of July 6, 1960 (Public Law 86–592), 74 Stat. 330. Claiming that the Executive Branch had no authority to impose such "fees," plaintiff sues to recover its payments.[1]

The general terrain over which the parties strive was molded long before 1960. The Supreme Court sketched the ground in Secretary of Agriculture v. Central Roig Ref. Co., 338 U.S. 604, 70 S.Ct. 403, 94 L.Ed. 381 (1950): "The sugar problem of the country is an old and obstinate one. For fourteen years Congress grappled with it through the mechanism of quotas. Three enactments, culminating in the Sugar Act of 1948, represented an effort to deal with what were deemed to be the harmful effects on interstate and foreign commerce of progressively depressed sugar prices of earlier years created by world surpluses, or, if one prefers it, by the conditions that reflected the imbalance between production and consumption." Id. at 615, 70 S.Ct. at 408–409. "The central aim of this legislation was to rationalize the mischievous fluctuations of a free sugar market by the familiar device of a quota system. The Jones-Costigan Act of 1934, 48 Stat. 670, 7 U.S.C.A. §§ 608, 608a, 609–611, 613, 615–617, 620, the Sugar Act of 1937, 50 Stat. 903, and the Sugar Act of 1948, 61 Stat. 922, 7 U.S.C. (Supp. II, 1949), §§ 1100–1160, 7 U.S.C.A. §§ 1100–1160. The volume of sugar moving to the continental United States market was controlled to secure a harmonious relation between supply and demand. To adapt means to the purpose of the sugar legislation, the Act of 1948 defines five domestic sugar-producing areas: two in the continental United States, and one each in Hawaii, Puerto Rico and the Virgin Islands. To each area is allotted an annual quota of sugar, specifying the maximum number of tons which may be marketed on the mainland from that area. § 202(a). A quota is likewise assigned to the Philippines. § 202(b). The balance of the needs of consumers in the continental United States, to be determined each year by the Secretary [of Agriculture], § 201, is met by importation from foreign countries, predominantly from Cuba, of the requisite amount of sugar. § 202(c). The quotas thus established apply to sugar in any form, raw or refined. In addition, § 207 of the Act establishes fixed limits on the tonnage of 'direct-consumption' or refined sugar which may be marketed annually on the mainland from the offshore areas as part of their total sugar quotas. But mainland refiners are not subject to quota

---

1. The parties have filed a stipulation of facts and agreed that the undisputed facts are sufficient for a decision without a trial.

limitations upon the marketing of refined sugar." Id. at 606–607, 70 S.Ct. at 404–405.[2]

Under the 1948 Act the Secretary of Agriculture determined for each year the total consumer sugar requirement of the United States. This total was then allocated to the domestic and foreign areas pursuant to the formula prescribed in the statute (as amended in 1951 and 1956). In 1959 the nation imported about $500,000,000 worth of sugar, of which approximately 70% was from Cuba, 22% from the Philippines, and 8% from the Dominican Republic, Peru, Mexico, and other Latin American countries; about one-third of the total American sugar supply came from Cuba. As a rule, the limitation on the supply of domestic and imported sugar in the United States has put the domestic price above the level of the world free market; the difference is known as the "quota premium." This favorable price has been, of course, an advantage to foreign producers able to export to the United States.

The course of the Castro regime in Cuba, combined with the approaching end of the 1948 Act (which by its terms was to expire at the end of 1960), reopened in 1960 the subject of quota-allocation. The first product of this reconsideration was the Act of July 6, 1960, Public Law 86–592, 74 Stat. 330, which extended the 1948 Act through March 31, 1961, and significantly amended its provisions. One modification authorized (but did not require) the President to reduce the Cuban quota for 1960 and the first quarter of 1961. A second amendment dealt with the "replacement" sugar which was to fill the gap caused by the anticipated decrease in Cuban imports; if the President reduced Cuban sugar below the level of the Sugar Act formula, and then determined that foreign supplies were needed to meet domestic consumption requirements, he was to apportion the "replacement" sugar among the quota countries (including the Dominican Republic) according to a set formula. The

statutory preface to this allocation provided (Section 408(b) (2) of the 1948 Act, as amended by the Act of July 6, 1960):

"For the purposes of meeting the requirements of consumers in the United States, the President is thereafter [i. e., after reducing the Cuban quota] authorized to cause or permit to be brought or imported into or marketed in the United States, at such times and from such sources, including any country whose quota has been so reduced, and subject to such terms and conditions as he deems appropriate under the prevailing circumstances, a quantity of sugar, not in excess of the sum of any reductions in quotas made pursuant to this subsection * * *."

Using this new authority, the President, as of July 8, 1960, drastically lowered the Cuban quota for the rest of 1960, and delegated his authority over "replacement" sugar to the Secretary of Agriculture, acting concurrently with the Secretary of State. Proclamation No. 3355, 25 F.R. 6414.

For "replacement" sugar, the then current problem was the Dominican Republic. In June 1960 an attempt had been made to assassinate President Betancourt of Venezuela. It was widely suspected that the Trujillo regime in the Dominican Republic had been connected with that scheme. In August, the Foreign Ministers of the American Republics, meeting under the auspices of the Organization of American States (OAS), concluded that this attempt was part of a plot to overthrow the Venezuelan Government which had been given moral and military help by high officials of the Trujillo government. The Foreign Ministers, deciding that collective action was justified under Article 19 of the charter of the OAS, condemned the participation of the Government of the Dominican Republic in the acts against Venezuela, and agreed to break diplomatic relations with the Dominican Republic and to interrupt

2. The Court's footnotes have been omitted and its paragraphing has been disregarded.

economic relations partially with that country.

Late in August 1960, the United States severed diplomatic relations with the Dominican Republic, and about the same time the President asked Congress to change the sugar legislation to permit him to allocate to the other countries the additional sugar to be purchased from the Dominican Republic under the Act of July 6, 1960. The bill passed by the House of Representatives, in response to this request, would have given this authority to the President only if, prior to October 15, 1960, the OAS had adopted collective economic sanctions against the Republic and the required number of member-states had implemented those sanctions. The Senate amended the bill in effect to provide flatly that the Dominican allocation of "replacement" sugar under the Act of July 6th could be purchased elsewhere. Congress adjourned, in September 1960, without resolving the differences between its two branches.

While the issue of Dominican participation in the plot against Venezuela was before the OAS, and the question of the Dominican "replacement" sugar was before Congress, the Secretary of Agriculture suspended importation of the Dominican "replacement" share under the Act of July 6th. After Congress adjourned without enacting further sugar legislation, the Secretary of Agriculture (with the concurrence of the Secretary of State) amended his Sugar Regulation 818 (effective September 26, 1960) to allocate to the Dominican Republic its proper part of "replacement" or non-quota sugar for 1960 under the Act of July 6th (i. e., 321,857 tons), but also to provide "as a condition for the importation of any quantity" of such Dominican sugar, that "a fee of $0.02 per pound, raw value, shall be paid * * * by the person applying to the Secretary for release of such quantity of sugar." Two cents per pound represented the difference between the then world market price and the higher American price. The fee in this amount was avowedly designed to eliminate that premium for Dominican non-quota sugar, so that the Dominican interests would not gain the special profits available to sugar imported into the American market. The same arrangements were made for the first quarter of 1961. The President reduced the Cuban quota to zero (Proclamation No. 3383, effective December 21, 1960), and the Secretaries fixed 222,723 tons as the Dominican portion of non-quota sugar for that period, with a fee of $.0225 per pound raw value as a condition of importation. Three companies, including plaintiff, imported non-quota Dominican sugar during the last half of 1960 and the first quarter of 1961—paying the fees. The entire Dominican share of the non-quota sugar for that period was brought into the country by these three firms. (No fee was imposed on any other type of imported sugar, either Dominican quota sugar or non-Dominican sugar (quota or non-quota).)

The problem, as well as the fee, disappeared after Congress, on March 31, 1961, passed Public Law 87–15, 75 Stat. 40, providing that non-quota sugar need not be purchased from countries with which the United States had no diplomatic relations.

Plaintiff's principal business was the purchase from a sister company of sugar produced in the Dominican Republic and the importation of that sugar into the United States. Because of its business situation in 1960 and 1961, plaintiff was compelled by economic necessity to import non-quota sugar into this country.[3] It therefore applied for importation permits

3. The parties have stipulated that (a) "plaintiff was under severe economic and other duress in 1960 and the first quarter of 1961 to import Dominican Republic non-quota purchase sugar and pay the fees thereon"; (b) if plaintiff had not imported this sugar it and its sister and parent companies would have lost the opportunity to earn a considerable amount of money; (c) the sister company would have had to pay the Dominican Government a production tax on the sugar allocated to that company even if the latter had not sold it for export to the United

and, under clear protest, paid the required "fees" imposed by the Sugar Regulations. In all, plaintiff brought in some 315,703,426 pounds of non-quota Dominican sugar from the fall of 1960 through March 31, 1961. It paid a total of $6,885,861.79 (after adjustment) in "fees." Suit is now brought for that amount.

## I

We dispose, first, of the arguments defendant proffers for closing the gate on plaintiff without allowing it to reach the merits. The main points are, in substance, that (i) this court has no jurisdiction to hear the claim because it sounds in tort and involves foreign affairs, and (ii) plaintiff is estopped to recover the fees because it chose to import the non-quota sugar and is therefore bound to accept the conditions imposed on that importation. Neither half of the argument persuades us.

 Congress has given this court power to hear claims against the United States founded upon "any Act of Congress." 28 U.S.C. § 1491. Plaintiff urges that under the Act of July 6, 1960, it was entitled to import non-quota Dominican sugar into this country without payment of any monetary exaction such as the fees levied here. The claim is, therefore, squarely bottomed on an Act of Congress and is directly covered by our general jurisdictional statute. Under that provision, suit can be brought in this court to recover exactions said to have been illegally imposed by federal officials (except where Congress has expressly placed jurisdiction elsewhere). Tax refund suits are the most common (see, e. g., United States v. Emery, Bird, Thayer Realty Co., 237 U.S. 28, 35 S.Ct. 499, 59

L.Ed. 825 (1915); United States v. Hvoslef, 237 U.S. 1, 9–11, 35 S.Ct. 459, 59 L.Ed. 813 (1915)), but there have been other instances (Dooley v. United States, 182 U.S. 222, 21 S.Ct. 762, 45 L.Ed. 1074 (1901); Compagnie General Transatlantique v. United States, 21 F.2d 465 (S.D. N.Y. 1927), aff'd, 26 F.2d 195 (C.A. 2, 1928); Carriso, Inc. v. United States, 106 F.2d 707 (C.A. 9, 1939)). Such a claim is not barred as sounding in tort; nor need there be any specific consent-to-suit apart from the Tucker Act (Aycock-Lindsey Corp. v. United States, 171 F.2d 518, 520–521 (C.A. 5, 1948)). The precise issue was thoroughly canvassed in Clapp v. United States, 117 F.Supp. 576, 127 Ct.Cl. 505, cert. denied, 348 U.S. 834, 75 S.Ct. 55, 99 L.Ed. 658 (1954), and the court ruled that such a demand does fall within 28 U.S.C. § 1491. Clapp has been followed since (Eversharp, Inc. v. United States, 125 F.Supp. 244, 247, 129 Ct.Cl. 772, 775–776 (1954); Pan American World Airways, Inc. v. United States, 122 F.Supp. 682, 683, 129 Ct.Cl. 53, 55–56 (1954); Gmo. Niehaus & Co., C. por A. v. United States, 153 F.Supp. 428, 432, 139 Ct.Cl. 605, 612 (1957); Seatrade Corp. v. United States, 285 F.2d 448, 449, 152 Ct.Cl. 356, 359 (1961); Suwannee S. S. Co. v. United States, 279 F.2d 874, 150 Ct.Cl. 331 (1960)),[4] and we now adhere to it for plaintiff's claim. The foreign affairs aspects of this case do not take it outside Clapp; those phases may bear upon the decision of the merits but they do not, of themselves, deprive us of the power to approach the merits in a controversy which is otherwise within our jurisdiction. Cf., e. g., Societe Anonyne des Ateliers Brillie Freres v. United States, Ct.Cl., No. 392–59, decided January 11, 1963; Seery v. United States,

States; (d) the Dominican Government would have reduced the sister company's share of the Dominican quota for future years; (e) plaintiff would not have been able to find customers in the world free market for all of its non-quota sugar "except at prices at or below the cost of production of such sugar"; and (f) plaintiff could not have delayed arranging for the production, purchase and importation of its non-quota sugar imported during the relevant period and still have been able to import all the non-quota sugar it did.

4. See, also, Fawick Corp. v. United States, 149 Ct.Cl. 623, 637 (1960); American President Lines, Ltd. v. United States, 291 F.2d 931, 936, 154 Ct.Cl. 695, 705 (1961).

127 F.Supp. 601, 130 Ct.Cl. 481 (1955); Derecktor v. United States, 128 F.Supp. 136, 129 Ct.Cl. 103 (1954), cert. granted, 348 U.S. 926, 75 S.Ct. 336, 99 L.Ed. 725, cert. dismissed, 350 U.S. 802, 76 S.Ct. 37, 100 L.Ed. 722 (1955).

▇▇▇ The second of the Government's initial defenses concentrates on the fact that plaintiff applied to import the sugar and then paid the disputed fees (though under protest). The theory is that plaintiff, having had the advantage of the privilege of importing, must take the hair with the hide. This case differs, however, from several on which defendant relies (notably Hamilton v. Dillin, 21 Wall. 73, 90–92, 22 L.Ed. 528 (1874)) in that the importer's contention is that it had a right under the Act of July 6, 1960, to bring in its Dominican sugar free of the fees—not a mere "privilege" to apply for discretionary permission.[5] Asserting that unconditional right, plaintiff is not bound by illegal administrative conditions hobbling its statutory entitlement. This would have been so even if the plaintiff had not been spurred by a strong business need to import the sugar. See Stark v. Wickard, 321 U.S. 288, 303–305, 64 S.Ct. 559, 88 L.Ed. 733 (1944). The plaintiff's standing in that event would be no worse than that of a corporation which can avoid a threatened (but improper) stamp or excise tax by abandoning the transaction or casting it in a different form; the right of such a company to continue its program, pay the disputed tax, and then sue for a refund cannot be doubted. This plaintiff has a still stronger position because it acted, defendant agrees, under business duress in introducing the sugar into the United States. The courts have long held that persons who protestingly pay money to the Government, under the sting of business compulsion, are not volunteers and may sue to recover. See Swift Courtney & Beecher Mfg. Co. v. United States, 111 U.S. 22, 28–30, 4 S.Ct. 244, 28 L.Ed. 341 (1884); Oceanic Steam Nav. Co. v. Stranahan, 214 U.S. 320, 329, 29 S.Ct. 671, 53 L.Ed. 1013 (1909); Atchison, Topeka & Santa Fe Ry. Co. v. O'Connor, 223 U.S. 280, 285–287, 32 S.Ct. 216, 56 L.Ed. 436 (1912); Union Pacific R. R. Co. v. Public Serv. Comm'n, 248 U.S. 67, 70, 39 S.Ct. 24, 63 L.Ed. 131 (1918); B & B Amusement Enterprises v. City of Boston, 297 Mass. 307, 309, 8 N.E.2d 788 (1937); A.L.I., Restatement of Restitution, p. 323. Cf. J. C. Pitman & Sons, Inc. v. United States, Ct.Cl., decided May 10, 1963, slip op., pp. 4–6, 317 F.2d 366.[6]

II

The dispute on the merits is whether the Act of July 6, 1960, authorized the imposition of these entry fees. Plaintiff does not contest the constitutional power of Congress to levy such fees, or challenge the Secretaries' action if the President himself could have imposed the same requirement under the statute, or dispute the exercise of discretion if basic power existed.[7] The single question is whether the Congressional authorization to the President, with respect to non-quota sugar replacing the Cuban allotment, to impose "such terms and conditions as he

5. Even in the case of a discretionary "privilege," the last word has not yet been said, judicially, on a permittee's standing to challenge conditions. See, e.g., French, Unconstitutional Conditions: An Analysis, 50 Georgetown L.J. 234 (1961); Note, Unconstitutional Conditions, 73 Harv.L.Rev. 1595 (1960); Hale, Unconstitutional Conditions and Constitutional Rights, 35 Colum.L.Rev. 321 (1935); Merrill, Unconstitutional Conditions, 77 U.Pa.L.Rev. 879 (1929). Cf. Gonzalez v. Freeman, C.A.D.C., decided May 7, 1964, 334 F.2d 573–575.

6. Defendant also suggests that the parent or sister company, not plaintiff, is the proper party, but it was the plaintiff which paid the challenged fees and we see no reason why it may not bring the action.

7. In other words, the plaintiff does not attack the delegation of authority to the Secretary of Agriculture (acting with the concurrence of the Secretary of State), or claim that the Secretary acted improperly under that delegation, or attack the amount of these particular fees (if some fees were authorized).

deems appropriate under the prevailing circumstances" covers these compensating fees.

1. It is common ground that the fees were imposed in order to further the then foreign policy of the United States. The OAS had condemned the Dominican Republic (for its part in the attempt to murder the President of Venezuela) and had resolved that member nations (a) should break diplomatic relations with that government, (b) suspend any arms trade with it, and (c) study the feasibility and desirability of extending trade supervision to other articles. In addition, there was widespread revulsion against the internal excesses of the Trujillo regime. The United States was prepared to take further action at once and, as we have pointed out, did suggest unsuccessfully to Congress (in August 1960) the modification of the Sugar Act to permit the purchase elsewhere of non-quota Dominican sugar; meanwhile, no Dominican "replacement" sugar was authorized for purchase.[8] At the hearings before the House Committee on Agriculture, in August, Under Secretary of State Dillon said, after referring to the recent action of the OAS:

> "In the light of these circumstances, it is apparent that the U.S. Government would be in an extremely equivocal position if our Government were now to grant to the Dominical [sic] Republic an economic benefit by authorizing the additional purchase of nearly four times as much sugar as the United States imported from that country last year, especially when more than one-third of the purchase value would be a windfall resulting from the premium of the U.S. price over the world price.
>
> "To reduce the sugar quota of a country with a leftist dictator [Cuba] only to grant a substantial portion of that quota to a dictator whose activities have been formally condemned by all American States would seriously handicap the conduct of our foreign relations throughout the hemisphere."

Congress having risen without taking action, the Administration then utilized the power it thought it had, with respect to "replacement" sugar, under the Act of July 6th in order to foster the same foreign policy ends—so far as it could within the framework of existing law. When the Sugar Regulations were amended to authorize importation of Dominican "replacement" sugar and to require the challenged fee, the Secretary of Agriculture formally found (with the concurrence of the Secretary of State) that "under the prevailing circumstances it is in the National interest to provide that the quantity of non-quota sugar hereby authorized for purchase from the Dominican Republic should be purchased at prices which are lower than those currently prevailing for sugar for the United States market. Accordingly, provision is made for a fee per pound, raw value, to be paid to the United States Government on all non-quota purchase sugar imported from the Dominican Republic" (25 F.R. 9199, Sept. 27, 1960).[9]

Shortly thereafter the State Department published an Aide Memoire to Venezuela, pointing out that the President was required by the Act of July 6th to authorize the importation of non-quota (or "replacement") Dominican sugar but that he had "observed the spirit of the Sixth Meeting of Foreign Ministers [of the OAS] within his existing authority, by imposing a fee of two cents per pound on purchases of sugar from the Dominican Republic, which purchases the law required to be authorized. This has the

---

8. The Dominican share of non-quota sugar, under the Act of July 6th, far exceeded the normal quota (under the Sugar Act of 1948) for sugar from that country. It was therefore thought that importation of the non-quota sugar for sale at the high American price would be a substantial stimulus to the Trujillo regime.

9. The same finding was later made for the first quarter of 1961 (25 F.R. 13864, Dec. 29, 1960).

effect of establishing a price for such imports approximating the world market price rather than the higher United States price which would otherwise have prevailed. The Dominican Republic thus has been deprived of special benefits enjoyed by all other countries which currently sell sugar in the United States market." The same explanation was given informally to other interested Latin American nations.

Plaintiff does not attack these foreign policy objectives as subterfuges, or as unwarranted in the light of then current events. In any case, the court is required to accept the Executive's determination that these were proper goals of American foreign policy.[10] The litigable issue is whether these ends could lawfully be furthered, under the Act of July 6th, by requiring the entry fees.

2. If there were no legislative history of the Act of July 6th, would it be read on its face to authorize the President to implement foreign policy by imposing these payments? We think that it would.

The terms of the Act [11] are very clear on four points. The first is that the

10. See Oetjen v. Central Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918); United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319–321, 57 S.Ct. 216, 81 L.Ed. 255 (1936); United States v. George S. Bush & Co., 310 U.S. 371, 379–380, 60 S.Ct. 944, 84 L.Ed. 1259 (1940); Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 111–112, 115, 68 S.Ct. 431, 92 L.Ed. 568 (1948); Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 423–424, 427–428, 431–433, 436, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964).

11. The relevant provisions of Public Law 86–592, the Act of July 6th, 74 Stat. 330, are in full text as follows:

"Sec. 3. Section 408 of the Sugar Act of 1948, as amended (relating to suspension of quotas), is amended to designate such section as subsection '(a)'; and to add a new subsection '(b)' as follows:

"(b) Notwithstanding the provisions of title II of this Act, for the period ending March 31, 1961:

"(1) The President shall determine notwithstanding any other provisions of title II, the quota for Cuba for the balance of calendar year 1960 and for the three-month period ending March 31, 1961, in such amount or amounts as he shall find from time to time to be in the national interest: Provided, however, That in no event shall such quota at any time exceed such amount as would be provided for Cuba under the terms of title II in the absence of the amendments made herein, and such determinations shall become effective immediately upon publication in the Federal Register of the President's proclamation thereof;

"(2) For the purposes of meeting the requirements of consumers in the United States, the President is thereafter authorized to cause or permit to be brought or imported into or marketed in the United States, at such times and from such sources, including any country whose quota has been so reduced, and subject to such terms and conditions as he deems appropriate under the prevailing circumstances, a quantity of sugar, not in excess of the sum of any reductions in quotas made pursuant to this subsection: Provided, however, That any part of such quantity equivalent to the proration of domestic deficits to the country whose quota has been reduced may be allocated to domestic areas and the remainder of such quantity (plus any part of such allocation that domestic areas are unable to fill) shall be apportioned in raw sugar as follows:

"(i) There shall first be purchased from other foreign countries for which quotas or prorations thereof of not less than three thousand or more than ten thousand short tons, raw value, are provided in section 202(c), such quantities of raw sugar as are required to permit importation in such calendar year of a total of ten thousand short tons, raw value, from such country;

"(ii) There shall next be purchased from the Republic of the Philippines 15 per centum of the remainder of such importation;

"(iii) The balance, including any unfilled balances from allocations already provided, shall be purchased from foreign countries having quotas under section 202(c), other than those provided for in the preceding subparagraph (i), in amounts prorated according to the quotas established under section 202(c): Provided, That if additional amounts of sugar are required the President may authorize the purchase of such amounts from any foreign countries, without regard to allocation;

"(3) If the President finds that raw sugar is not reasonably available, he may, as provided in (2) above, cause or per-

President was to be free, despite the previous requirements of the Sugar Act, to determine the Cuban sugar quota "for the balance of calendar year 1960 and for the three-month period ending March 31, 1961, in such amount or amounts as he shall find from time to time to be in the national interest." He could maintain that quota or reduce it in any degree, down to zero. Second, if the Cuban quota was lowered, the President had discretion, "[f]or the purposes of meeting the requirements of consumers in the United States," to permit or cause the importation of "replacement" sugar in substitution for the reduced Cuban quota. Third, if the President decided to bring in such "replacement" sugar, he was required to apportion that sugar in a prescribed manner, including a mandatory portion for Dominican sugar based on its regular statutory quota. Fourth, if the President determined to import "replacement" sugar from the designated sources, he still had some discretion; he could do so "at such times" and "subject to such terms and conditions as he deems appropriate under the prevailing circumstances."

As they impinge on the present case, these provisions merge into the proposition that if the President, after reducing the Cuban quota, desired "replacement" sugar he would have to have it imported from the Dominican Republic (among other places) in accordance with a set formula, but he nevertheless could elect to impose conditions "appropriate under the prevailing circumstances"—conditions which did not contravene the Congressional directive that a certain share of the Dominican commodity be imported as non-quota sugar.

We think it plain that, in exercising this discretion to impose suitable conditions, the President (or his delegates) could take account of foreign policy considerations. The Act of July 6th, as a whole, obviously involved foreign policy, as well as economic and commercial objectives. The grant of presidential authority to reduce or eliminate the Cuban sugar quota followed upon the advent of the Castro regime, with its impact both on American interests in that island and on the rest of the hemisphere; this part of the Act brought in its train significant consequences in the area of foreign affairs (some of which the Supreme Court had recently to take into consideration in Banco Nacional de Cuba v. Sabbatino, decided March 23, 1964 (see 376 U.S. 398, 400–404, 84 S.Ct. 923)).

Admitting that the Cuban facet of the Act directly involved external policy, plaintiff denies that there was any such foreign-affairs coloration to the provisions on "replacement" sugar. But a statute giving any substantial discretion with respect to the importation of a critical commodity like sugar from competing foreign countries can normally be expected to involve foreign policy in applying that discretion. In the intercourse of nations, changes in economic relationships have many an important political corollary. It would be difficult, and probably unwise, to separate an executive choice in that area from the "important, complicated, delicate and manifold problems" facing the President in the "vast external realm" (United States v. Curtiss-Wright Corp., 299 U.S. 304, 319, 57 S.Ct. 216, 220 (1936)). It is for this reason, we judge, that Congress granted power in the Act of July 6th to the President himself, not to the Secretary of Agriculture whose usual duty it was to apply the quota mandates of the Sugar Act of 1948.[12] Within the limited sphere of discretion left to him, the President, with the advice of the State Department as well as of the Agriculture Department, could appraise and balance both foreign and domestic elements.[13]

mit to be imported such quantity of sugar in the form of direct-consumption sugar as may be required."

12. We point out infra that the legislative history of the Act of July 6th confirms

that the Congress was keenly aware of the bearing of foreign affairs upon the new enactment.

13. The Sugar Act of 1948, itself, and its pre-1960 amendments had foreign policy

Plaintiff, denying that both phases were to be considered, contends that the conveyance of authority on "replacement" sugar was tied by the statute to the solitary standard of "meeting the requirements of consumers in the United States." We think, however, that the consumer criterion was intended to govern the President's decision whether or not to seek "replacement" sugar (as well as the amount), and not to shrink his authority to impose "such terms and conditions as he deems appropriate under the prevailing circumstances," once he had determined on the purchase of non-quota sugar. The "consumer" clause does not deny the President the authority which would be normally inherent in that concomitant general award of authority.

Even without any foreign affairs component, that statutory phrase would be a wide grant of executive authority within the area left to the President, comparable to many which the Supreme Court has upheld and applied liberally. See American Power & Light Co. v. Securities & Exchange Comm'n, 329 U.S. 90, 105–106, 67 S.Ct. 133, 91 L.Ed. 103 (1946); Fahey v. Mallonee, 332 U.S. 245, 249–250, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947); Yakus v. United States, 321 U.S. 414, 426–427, 64 S.Ct. 660, 88 L.Ed. 834 (1944); New York Central Securities Corp. v. United States, 287 U.S. 12, 24–25, 53 S.Ct. 45, 77 L.Ed. 138 (1932). Every part of the phrase—

"terms and conditions," "he deems appropriate", "under the prevailing circumstances"—is unqualified and carries the broadest connotations. Cf. Shawmut Ass'n v. Securities & Exchange Comm'n, 146 F.2d 791, 795 (C.A. 1, 1945). In their natural use in English, these are words of very large scope.

The presence of foreign factors adds still more to the range of the powers transmitted by the phrase because, as the Supreme Court has explicitly recognized, a delegation of unusually extensive discretion to the President is not uncommon in the external realm. "Practically every volume of the United States Statutes contains one or more acts or joint resolutions of Congress authorizing action by the President in respect of subjects affecting foreign relations, which either leave the exercise of the power to his unrestricted judgment, or provide a standard far more general than that which has always been considered requisite with regard to domestic affairs." United States v. Curtiss-Wright Corp., 299 U.S. 304, 324, 57 S.Ct. 216, 222–223 (1936). See, also, id. at 321–322,[14] and 327, 57 S.Ct. at 221, 224; Panama Ref. Co. v. Ryan, 293 U.S. 388, 421–422, 55 S.Ct. 241, 79 L.Ed. 446 (1935); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635–636, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (opinion of Mr. Justice Jackson); Field v. Clark, 143 U.S. 649, 680 et seq., esp. 690–691,

---

as well as domestic objectives. The selection of foreign quotas was dictated, in part, by factors deemed important in our relations with the countries of Latin America and with the Philippines; expansion of trade relations was also a prominent element. See Hearings on Extension of Sugar Act of 1948 before House Committee on Agriculture, 82d Cong., 1st Sess., ser. J, at 77–78 (1951); Hearings on H.R. 5406 before the same committee, 84th Cong., 2d Sess., ser. Z, at p. 16 (1955); Hearings on H.R. 7030 before the Senate Committee on Finance, 84th Cong., 2d Sess., at pp. 18, 21 (1956); H.R.Rep.No. 1348, 84th Cong., 1st Sess., p. 9 (1955).

14. At pp. 321–322 of 299 U.S., at p. 221 of 57 S.Ct., the Court said:

"When the President is to be authorized by legislation to act in respect of a matter intended to affect a situation in foreign territory, the legislator properly bears in mind the important consideration that the form of the President's action—or, indeed, whether he shall act at all—may well depend, among other things, upon the nature of the confidential information which he has or may thereafter receive, or upon the effect which his action may have upon our foreign relations. This consideration, in connection with what we have already said on the subject discloses the unwisdom of requiring Congress in this field of governmental power to lay down narrowly definite standards by which the President is to be governed."

12 S.Ct. 495, 36 L.Ed. 294 (1892); Star-Kist Foods, Inc. v. United States, 275 F. 2d 472–480, 47 CCPA 52 (1959). In the external sector of the national life, Congress does not ordinarily bind the President's hands so tightly that he cannot respond promptly to changing conditions or the fluctuating demands of foreign policy. Accordingly, when Congress uses far-reaching words in delegating authority to the President in the area of foreign relations, courts must assume, unless there is a specific contrary showing elsewhere in the statute or in the legislative history, that the legislators contemplate that the President may and will make full use of that power in any manner not inconsistent with the provisions or purposes of the Act. In a statute dealing with foreign affairs, a grant to the President which is expansive to the reader's eye should not be hemmed in or "cabined, cribbed, confined" by anxious judicial blinders.[15]

 3. Exercising his discretion in the light of the needs of United States foreign policy, the President (through his delegates) could lawfully deem it an "appropriate" "condition" of importation, "under the prevailing circumstances," to require a fee on "replacement" sugar from the Dominican Republic which would deprive the Trujillo regime of the special premium of the United States price (over the world price). That fee (equal to the premium) would not, and did not, prevent the importation of non-quota Dominican sugar since the importers would (and did) get the equivalent of the world price. The full Dominican share of non-quota sugar for 1960–1961 was imported and sold. There was, therefore, no violation of the statutory requirement that a certain proportion of non-quota sugar come from the Dominican Republic. That directive was entirely fulfilled. At the same time, the Executive felt that it was serving the nation's policy toward Latin America by depriving the Dominican Government of the American sugar bonus. The OAS had condemned that government for participating in the attempt on President Betancourt; diplomatic relations had been broken; the OAS members were studying the possibility of economic sanctions; this country was prepared to go even further in attempting to insure respect for human rights in and by the Dominican Republic. The State Department was convinced that it would redound against the nation in Latin America to transfer some of the quotas previously assigned to Cuba, ruled by "a leftist dictator," to a country ruled by a rightist dictator "whose activities have been forcibly condemned by all American States." In its Aide Memoire to Venezuela (which had expressed concern over the Secretaries' grant of authorization to import non-quota sugar from the Dominican Republic) the Department replied that under the Act of July 6th the United States had no other choice, but that by imposing the compensating fee the President had "observed the spirit of the Sixth Meeting * * * [of the OAS] within his existing authority" so as to deprive the Dominican Republic "of special benefits enjoyed by all other countries which currently sell sugar in the United States market. * * * [T]he United States price benefits of which the Dominican Republic is thus deprived, would amount to an estimated thirteen million dollars for this calendar year, provided of course that the imports presently authorized actually take place."

15. The failure of Congress to repeat for "replacement" sugar the term "in the national interest" (which it had used for Cuban sugar) is not meaningful. The President's discretion with respect to "replacement" sugar was, of course, much narrower, and ample scope was given by the standard of "such terms and conditions as he deems appropriate under the prevailing circumstances." In the context, the latter standard can be said to embrace the "national interest" as it applied to the more limited field. We point out infra that the "such terms and conditions" phrase came from a presidential proposal which would have given him full discretionary authority with respect to "replacement" sugar, as well as Cuban sugar.

It is noteworthy, in this connection, that the company producing about 60% of Dominican sugar (and supplying the same percentage of Dominican imports to this country) was owned or operated for the benefit of Generalissimo Trujillo or his family. Prior to the reduction and elimination of the Cuban quota, only a small part of the Dominican sugar production came to the United States. But the non-quota share was much larger; if the "replacement" sugar from the Republic had been allowed to be brought in without the fees, the increase in imports would have meant that more than one-half of the sugar income of that country for 1960 would have been derived from sales in the United States market. Of this large expansion, the Trujillo regime and family would have been the principal beneficiaries. Since about 65% of the total income of the Dominican Republic was derived from the sale of sugar abroad, it can easily be seen that to allow the importation and sale of the non-quota sugar at the domestic price could have helped significantly to shore up the Trujillos. The fee removed that unintended effect of the "replacement" requirements. In addition, the imposition of the fee reduced (by about 3.4 million dollars) a Dominican Republic sugar tax which was measured in part by the net price obtained for exported Dominican sugar; this reduction in the tax had the effect of restricting other funds available to the Generalissimo. It seems plain that the fee could be deemed an "appropriate" "condition" "under the prevailing circumstances"—in the normal sense of those words.

4. It is suggested, however, that—whatever may have been the foreign-policy gain from the fees and however laudable the objectives—the President could not seek to attain those ends by imposing a monetary exaction on importers. Although it may be otherwise consonant with the basic Congressional directive in the statute, a monetary imposition (it is said) is so close to a tax or a customs duty that it can be levied only by Congress itself, or pursuant to a very explicit Congressional authorization. We think that the Supreme Court has already given the answer. In J. W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928), involving presidential power to increase or decrease customs duties under the Tariff Act of 1922, the Court said, through Chief Justice Taft (276 U.S. at 409, 48 S.Ct. at 352):

"It is conceded by counsel that Congress may use executive officers in the application and enforcement of a policy declared in law by Congress and authorize such officers in the application of the congressional declaration to enforce it by regulation equivalent to law. But it is said that this never has been permitted to be done where Congress has exercised the power to levy taxes and fix customs duties. The authorities make no such distinction. The same principle that permits Congress to exercise its rate-making power in interstate commerce by declaring the rule which shall prevail in the legislative fixing of rates, and enables it to remit to a rate-making body created in accordance with its provisions the fixing of such rates, justifies a similar provision for the fixing of customs duties on imported merchandise."

History furnishes both the detailed support for, and the content of, this proposition. As we have already indicated, in the foreign field the President can utilize a general statutory authorization to take steps which, in the domestic area, might call for specific legislative action or perhaps a narrower delegation from Congress. Under broad grants, the President has imposed and lifted embargoes, prohibited and allowed exports, suspended and resumed commercial intercourse with foreign countries. See United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 322–327, 57 S.Ct. 216 (1936); Field v. Clark, 143 U.S. 649, 680 et seq., 12 S.Ct. 495 (1892). "Likewise, Congress has passed numerous acts laying tonnage and other

duties on foreign ships, in retaliation for duties enforced on United States vessels, but providing that, if the President should be satisfied that the countervailing duties were repealed or abolished, that he might by proclamation suspend the duties as to vessels of the nation so acting." 299 U.S. at 325, n. 2, 57 S.Ct. at 223. Conversely, the President has been empowered to impose additional duties "when he finds that the public interest will be served thereby" upon goods from countries discriminating against our commerce. Tariff Act of 1922, § 317, 42 Stat. 944–946; Tariff Act of 1930, § 338, 41 Stat. 704–706. Although the retaliatory provisions of the Tariff Act of 1890, 26 Stat. 612 (see Field v. Clark, 143 U.S. 649, 680–691, 12 S.Ct. 495 (1892)), did not refer at all to executive agreements, those provisions were utilized as the bargaining basis for at least twelve reciprocal trade agreements (with the same general objectives as the statutes) which were accepted by Congress as authorized. See Sen. Exec.Doc. 119, 52d Cong., 1st Sess., p. 2; 26 Cong.Rec. 6981–7000; Section 71 of the Tariff Act of 1894, 28 Stat. 569. The practice with respect to several later statutes authorizing restrictive measures has been similar; executive agreements have often been made, both under and apart from specific authorization, in order to effectuate the general statutory policy and other consistent policies. See McClure, International Executive Agreements (1941), pp. 84–92, and the implementation of the Reciprocal Trade Agreements Act, as amended (and related legislation), 19 U.S.C. § 1351 et seq.[16]

The sum of this historical practice is that, in the foreign area, Presidents have acted, unilaterally and bilaterally, in connection with legislation to change tariffs, to regulate quotas, to impose and lift embargoes, and to set conditions of entry. For our case the lesson is that, when Congress wrote that the President's actions on "replacement" sugar should be "subject to such terms and conditions as he deems appropriate under the prevailing circumstances," that expansive clause carried with it the power to take actions of the general type Presidents had previously taken—so long as those actions were not inconsistent with the requirements Congress had mandated. The broad statutory delegation incorporated, so far as it extended, the historical authority of the President in the fields of foreign commerce and of importation into the country. Though without any precise precedent, the imposition of the compensating fees was in line with prior Executive actions in comparable circumstances; at the same time, it did not contravene the mandate that a set portion of the non-quota sugar be a Dominican product.[17]

5. What we have said up to this point presupposes that the legislative history fails to show that Congress actually intended to forbid the President from taking such action. If that was Congress' deliberate desire, we could not properly hold that the general language used in the Act carried with it the normally broad reach of general grants to the President in the external realm. The stated Congressional purpose would override the ordinary and historical meaning

16. To the extent that this history was disregarded or overlooked in United States v. Guy W. Capps, Inc., 204 F.2d 655 (C.A. 4, 1953), the circuit's opinion was neutralized by the Supreme Court's opinion affirming the decision on other grounds. See 348 U.S. 296, 301, 305, 75 S.Ct. 326, 99 L.Ed. 329 (1955).

17. The validity of the fees is further supported by the part of the Act of July 6th which authorized the President, in certain circumstances, to import "replace-

ment" sugar from Cuba itself (i.e., a "country whose quota has been so reduced"). It is most unlikely that Congress meant to compel the President to allow the United States premium to such Cuban sugar—since pressure on Cuba was undoubtedly the focal point of the entire legislation—if it became necessary to take sugar from that country. But with respect to replacements there is no statutory ground for differentiating the Cuban from the Dominican commodity.

·of the words used. We find, however, that the Congress as a whole expressed no such aim. The subject of a compensating fee (or other comparable condition on importation) was never authoritatively discussed; this was a matter which was simply not covered by the reports and debates.

On March 15, 1960, the Administration asked the Congress to extend the Sugar Act of 1948 for an additional four years and to delegate to the President the authority to reduce the quota of any country other than the Philippines when he found it necessary to do so in the national interest or to assure adequate supplies of sugar, and then to permit the importation of a corresponding quantity of sugar from other sources. On May 19, 1960, the Chairman of the House Agriculture Committee introduced H.R. 12311, providing only for the extension of the Sugar Act for one additional year from its then expiration date of December 31, 1960. This bill was reported favorably on June 6, 1960, in a report which did not bear on the subject now concerning us. H.R.Rep. No. 1746, 86th Cong., 2d Sess. (1960), U.S.Code Cong. and Adm.News 1960, p. 2695. Thereafter, the Committee held sugar hearings at which the Secretary of State expressed his concern over Cuba as a source of supply. When H.R. 12311 came before the House on June 30, 1960, the Committee Chairman (at the direction of the Committee) offered on the floor an amendment giving the President authority to reduce the Cuban quota and likewise authorizing the importation of non-quota "replacement" sugar in a manner almost identical with that set forth in the final Act. The amendment was adopted and the bill passed the House. 106 Cong.Rec. 15227–15248.

The Senate first passed a resolution merely authorizing the President to reduce or eliminate the Cuban quota (S.J. Res. 217; S.Rep. No. 1883, 86th Cong., 2d Sess.; 106 Cong.Rec. 15644–46, 15661–64), and when this was promptly rejected by the House on technical grounds (106 Cong.Rec. 15818–19) the Senate then amended H.R. 12311 to give the President full discretion in the apportionment of "replacement" sugar to countries like the Dominican Republic (106 Cong.Rec. 15711–15729).[18] The House conferees would not agree to this amendment, and the conference report retained the mandatory character of the apportionment formula for non-quota sugar (eliminating, however, the references to this apportionment as an allocation and making other changes not now relevant). H.R.Rep. No. 2090, 86th Cong., 2d Sess. Both Houses adopted the conference agreement (106 Cong.Rec. 15729–15740 (Senate), 15827–15828 (House)), and the bill became law.

Plaintiff is, of course, right in saying that the final result in Congress was the mandatory instruction that, if "replacement" sugar was purchased, a set proportion would have to come from the Dominican Republic. Congress did affirmatively withhold from the President the discretion to reduce or eliminate that Dominican share. The clear terms of the Act to that effect are fully supported by the legislative history. But the plaintiff errs in saying that Congress also disclosed its intention of withholding all authority to impose on the Dominican Republic lesser economic sanctions which would not prevent the importation of its portion of the non-quota sugar. There is no statement in the conference report or by any sponsor of the legislation (in either branch of Congress) touching on that point. Discussion of "replacement" sugar centered almost exclusively on the black-or-white alternatives of either granting full discretion to the President to apportion as he saw fit, or of requiring him to use a statutory formula.[19] We

18. By a very close vote the Senate defeated an amendment which would have confined the bill to an authorization to the President to deal with the Cuban quota and would have left untouched the entire subject of "replacement" sugar. 106 Cong.Rec. 15726–15729.

19. There were some references by Senator Morse, opposing the conference re-

have pointed out that there is no inconsistency between binding the President to a set formula for the sources of "replacement" sugar and simultaneously giving him discretion to impose conditions consonant with that required apportionment. A refusal to give the President the whole loaf does not mean that a quarter or eighth loaf would not be proffered. As with prior sugar legislation, this Act would itself fix the sources of foreign sugar; the discretion left to the Executive, though significant, would be comparatively small.

Nothing pertinent was said as to the "terms and conditions"—"appropriate under the prevailing circumstances"—the President had the option to impose. These phrases came bodily from the Administration proposal of March 1960 which would have given the Executive full discretion as to "replacement" sugar (cf. 106 Cong.Rec. 5697–98; H.R.Rep. No. 79, 87th Cong., 1st Sess., pp. 9–10), U.S.Code Cong. and Adm.News 1961, p. 1520; in that context the broad language obviously had a broad compass. When the very same phrases were incorporated in the substitute sponsored by the House Agriculture Committee (H.R. 12311), there was nothing to suggest that the broad language was no longer intended to have its normal reach (within the smaller area to which it then applied). There was no discussion of the "terms and conditions"; that aspect of the problem was left wholly unexplored. Perhaps the reason was that at the time no one thought of the in-between position which would allow entry of Dominican non-

quota sugar, subject to some condition like a compensating fee. Nevertheless, the significant feature of the legislative history is that there was no denial of the grant of such authority, restricted but real, which was implicit in the general award of power to impose terms and conditions. That delegation remains unimpaired by anything said in the course of the bill's passage. When Congress employs broad language, and fails to show that it means those words to be applied more narrowly, courts must take the phrasing as it is.[20]

Plaintiff is also wrong, we think, in suggesting that Congress made it plain that foreign policy factors had no part, and were to have no part, in the apportionment of "replacement" sugar. The debates are sprinkled with references to the closeness of foreign affairs to the subject matter of the pending bill. These references are not confined to the question of the Cuban quota; the Congress, particularly the Senate, was well aware that the entire measure was entwined with considerations significant for the conduct of foreign relations. See e.g., 106 Cong.Rec. 15229, 15230, 15233, 15712, 15716–7, 15718, 15722, 15724, 15732–3, 15737–15739, 15740. There was no statement, or even indication, that in setting "terms and conditions" the President was bound to ignore the needs of foreign policy. In allowing foreign policy to influence their action, the President and his delegates were not contravening the expressed views of Congress.

The outcome is our holding that the Act of July 6, 1960, taking its text and

port, to the effect that under the mandatory provisions the Dominican Republic would receive an apportionment of "replacement" sugar, but even these observations did not relate to the special "terms and conditions" the President could and might impose upon that portion. 106 Cong.Rec. 15737, 15738. The same is true of statements by Senators, as the bill first passed that body, supporting full discretionary authority in the President on the ground (among others) that the Dominican Republic should not benefit from cuts in the Cuban quota. 106 Cong.Rec. 15719, 15724.

20. We do not give any weight to the consideration by Congress of sugar measures in 1960–1961, after the enactment of the Act of July 6, 1960. Even if it is proper to take that post-Act history into account (see Fogarty v. United States, 340 U.S. 8, 13–14, 71 S.Ct. 5, 95 L.Ed. 10 (1950); United States v. Price, 361 U.S. 304, 310–312, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960)), we find nothing helpful and certainly nothing conclusive. It appears clear that, in its later enactment, Congress left open the issue presented by this case. See 107 Cong.Rec. 4416.

background together with its legislative history, authorized the imposition of the challenged fees. Plaintiff is not entitled to recover. Its motion for summary judgment is denied and the defendant's motion is granted. The petition is dismissed.

WHITAKER, Judge (dissenting).

I cannot agree with the opinion of the majority. Briefly stated, my view is as follows.

It seems clear to me that the so-called "entry fee" imposed by the Secretary of Agriculture was not authorized by any Act of Congress and therefore was levied in violation of Article I, Section 8, Clause 1 of the Constitution, which vests, not in the Executive Branch of the Government, but in Congress, the "Power To lay and collect Taxes, Duties, Imposts and Excises." It cannot be denied that the "entry fee" was a duty or an impost. It was not intended or paid as compensation for services rendered by the Government in connection with plaintiff's importation of sugar; it was exacted from no importer of sugar except an importer of sugar from the Dominican Republic.

Only Congress can levy a duty or impost. No executive officer can do so unless Congress has delegated such power to him.

Further, the avowed purpose of the exaction of the "entry fee" was to regulate commerce in sugar between this country and the Dominican Republic. Article I, Section 8, Clause 3 of the Constitution vests this power in the Congress. The President or the Secretary of Agriculture may act in the field of foreign commerce only pursuant to an authorization by Congress.

The proposition that the imposition of the "entry fee" was justified because done in furtherance of the plenary authority of the President to conduct the foreign affairs of this country needs only the comment that, in doing so, he cannot usurp the powers committed to the Congress by the Constitution.

The "entry fee" cannot stand, therefore, unless Congress authorized the President or the Secretary of Agriculture to levy it. The majority opinion holds that this authority was given by the Act of July 6, 1960, 74 Stat. 330, which further amended the Sugar Act of 1948, as amended, 7 U.S.C. §§ 1100–1161 (1958).

Section 3(b) (1) of the Act of July 6, 1960, authorized the President to determine the Cuban quota for the importation of sugar into the United States. If his determination created a deficit in the domestic sugar supply, he was authorized to meet the sugar requirements of American consumers by permitting the importation of sugar, "at such times and from such sources, including any country whose quota has been so reduced, and *subject to such terms and conditions as he deems appropriate under the prevailing circumstances*," not in excess of the reduction in the Cuban quota. [Emphasis supplied.] It is said the italicized language gave the Secretary the right to impose the "entry fee."

In my opinion, an intention by Congress to surrender or delegate the exclusive prerogative committed to it by the Constitution, of levying duties and imposts, must be manifested by explicit language. I do not think that such an intention can be gathered from general language, authorizing the President to impose terms and conditions.

I suppose that all would agree that this general language was not intended to give the President authority to thwart the purpose of Congress in enacting the statute. Nor would anyone deny that any term or condition imposed by the President must be within the scope of the Congressional purpose in passing the Act and must further that purpose. Plainly, Congress did not intend to give the President authority to do anything not germane to that purpose.

What was the purpose of Congress in enacting this legislation? It was to give the President authority to impose sanctions on Cuba by reducing its sugar quota and to eliminate any deficit in the

supply of sugar resulting therefrom. That was the whole purpose. Whatever term or condition that might be imposed by the President could not go outside the boundaries of that purpose.

There is nothing expressed in the Act, or to be implied from it, that indicates an intention to impose sanctions on any country other than Cuba. But, if such an intention can be read into the statute, upon whom is the sanction to be imposed? There were 14 countries with sugar quotas, from which the so-called "replacement sugar" was to be obtained; upon which one were sanctions to be imposed? We cannot, I suggest, find anywhere an authority to single out the Dominican Republic or any other country as the object of economic sanctions. That the imposition of the "entry fee" on Dominican sugar was done for the purpose of imposing such sanctions on that nation is not open to question. The stipulation of facts makes this clear.

Congress had no intention of imposing sanctions on any country other than Cuba. Indeed, the legislative history of this Act indicates that Congress considered and expressly declined to impose sanctions on the Dominican Republic.

Congress did not explicitly authorize the device of an "entry fee." In particular, it did not authorize the President to impose it on the imports of one of the 14 countries and not on the others. It was imposed without Congressional authority. It was an usurpation of the authority of Congress to impose duties and imposts and of its authority to regulate commerce with foreign nations.

In the Act, the authority to impose terms and conditions on the importation of "replacement" sugar, to supply the deficit in Cuban sugar, was subject to a proviso that set out explicitly and in great detail how this deficit was to be met. The President was first required to allocate a portion of the deficit to domestic producers of sugar; second, to countries having a quota from 3,000 to 10,000 tons, he was required to allocate enough to bring their quotas up to 10,000

tons; third, he was required to allocate 15 percent of the remainder to the Republic of the Philippines; and he was then required to prorate the balance among other quota countries in proportion to their quotas.

Thus, an importer of sugar from the Dominican Republic was entitled under the Act to import an amount of sugar, in addition to the Dominican Republic's preexisting quota, in the proportion that that quota bore to the combined quotas of all other quota countries, except the Philippines. The President had no power to deprive an importer of this right, as the majority admits.

As the Executive Branch administered the statute, every quota country was given this right, save only the Dominican Republic. The sugar imports of this country alone were subjected to the payment of an "entry fee." Not only did this requirement lack Congressional authority, it was also directly contrary to the Congressional intent. That plainly expressed intent was that imports of replacement sugar from the quota countries, including the Dominican Republic, should be proportionate to their quotas.

The President had asked for authority to assign replacement sugar to such countries as he might select, but Congress expressly refused to give him such authority. It required, by the express terms of the Act, that imports of replacement sugar should come from all quota countries. The Dominican Republic was one of the countries having a sugar quota. Congress required that the replacement sugar should come from that country, in an amount prescribed by a stated formula.

But the President ruled, through the Secretary of Agriculture, that even though such sugar could be imported, the importer could do so only by paying an "entry fee." Was this carrying out the intent of Congress? On the contrary, it was a restriction of it, a limitation upon it. It impeded, rather than furthered, the Congressional will. Under the statute passed by Congress, imports

from the Dominican Republic were placed on a parity with imports from other quota countries. This means that an importer from that country could buy sugar there and sell it here at the United States price, which was generally about two cents a pound above the world price. But, contrary to the Congressional intent, the President required the importer to pay a "fee" that deprived him of the benefit of the United States price before he was permitted to bring in any sugar at all.

I do not think that anyone can doubt that this was a restriction and a limitation upon imports of replacement sugar from the Dominican Republic, imposed in the face of a clearly expressed Congressional intent that such imports should be unrestricted and unlimited, to the extent of that country's pro rata share. What power had the President so to limit, so to restrict the will of Congress? From what source was such power derived? The imposition of this fee was an usurpation of the powers committed to Congress by the Constitution.

I respectfully dissent.