# Authority of the President to Restrict Munitions Imports Under the Arms Export Control Act

Restricting the import of certain classes of Russian firearms and ammunition that are deemed an unacceptable risk to public safety is a legitimate use of the President's authority under the Arms Export Control Act to restrict the import of munitions in furtherance of United States foreign policy.

February 9, 1996

MEMORANDUM OPINION FOR THE SPECIAL ASSISTANT TO THE PRESIDENT
AND LEGAL ADVISOR TO THE NATIONAL SECURITY COUNCIL

This letter addresses and explains the basis for the oral advice that we provided in early April 1995 regarding the President's authority under the Arms Export Control Act, 22 U.S.C. §§ 2751–2799aa–2, ("AECA") to restrict the import of certain munitions from the Russian Federation in furtherance of United States foreign policy. The question arises in connection with the Administration's plan, as part of a general program of eliminating Cold War restrictions on trade and economic cooperation with Russia, to take steps to remove Russia from the International Traffic in Arms Regulations ("ITAR") list, which provides that it is the policy of the United States to deny licenses for the import of defense articles originating in certain countries, including Russia. 27 C.F.R. § 47.52 (1995). Russia's presence on the ITAR list means American businesses are not granted licenses necessary to import Russian munitions. Once Russia is off the ITAR list, there would be no general prohibition on gun imports from Russia. We understand that the issue concerns the negotiation of voluntary export restraints with Russia to ensure that, once Russia is removed from the ITAR list, munitions imports from Russia would not jeopardize public safety. [1] The question has been raised whether the President possesses authority under the AECA to limit the import of munitions from Russia. We have concluded that restricting the import of Russian munitions to certain classes of firearms and ammunition is a legitimate use of the President's authority under the AECA to restrict the import of munitions in furtherance of United States foreign policy.

Section 38 of the AECA authorizes the President to control the import and the export of defense articles and defense services "[i]n furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). Section 38 further authorizes the President "to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services." *Id.* The Act generally requires a license as a condition

---

[1] We understand that the issue may also have been raised whether voluntary restraint agreements restricting imports of Russian munitions violate the General Agreement on Tariffs and Trade or World Trade Organization rules. We have taken no position on that issue.

of exporting or importing any defense articles so designated by the President. 22 U.S.C. § 2778(b)(1)(B)(2).

By Executive Order 11958, as amended, the President has delegated his authority under section 38 to the Secretaries of State, Treasury, and Defense. Exec. Order. No. 11958, 3 C.F.R. 79 (1978), *reprinted as amended in* 22 U.S.C. § 2751 note (1996). The delegation grants the Secretary of the Treasury primary responsibility for issuing and administering permanent import controls of defense articles and services, and grants the Secretary of State primary responsibility for issuing and administering regulations relating to the rest of section 38, including export restrictions. The Secretary of the Treasury's authority over imports is subject to the qualification that the Secretary "shall be guided by the views of the Secretary of State on matters affecting world peace, and the external security and foreign policy of the United States." *Id.* § 1(l)(2), 3 C.F.R. at 81, *reprinted as amended in* 22 U.S.C. § 2751 note. We understand that, pursuant to this qualification, it has been the consistent practice of the Secretary of the Treasury to defer to the Secretary of State's views on these matters.

Pursuant to the delegation of authority, the Departments of State and Treasury issued regulations to implement the Act. *See* International Traffic in Arms Regulations, 22 C.F.R. pts. 120–130 (1995) (State Department regulations); Importation of Arms, Ammunition and Implements of War, 27 C.F.R. pt. 47 (1995) (Treasury Department regulations). The designation of defense articles subject to import restrictions is set forth in the U.S. Munitions Import List at 27 C.F.R. § 47.21 and includes categories for firearms and ammunition.

We understand that one part of the Administration's trade negotiation with Russia involves the possible importation into the United States from Russia of arms for sporting and hunting purposes. The Administration intends to continue to prevent imports of certain classes of weapons that are deemed to pose an unacceptable risk to public safety. In our view, the AECA would authorize imposition of controls on such imports.

As previously stated, section 38 authorizes the President to control the import of defense articles "[i]n furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). The Federal Circuit recently affirmed the President's authority under the AECA to prohibit the import of arms in furtherance of foreign policy objectives. *B-West Imports, Inc. v. United States*, 75 F.3d 633 (Fed. Cir. 1996). We understand that the Administration's objective in removing Russia from the ITAR list is to improve American-Russian trade relations, remove Cold War restrictions to economic cooperation, and expand economic opportunities for both countries. These objectives reflect significant United States foreign policy goals. Thus, there can be no doubt that the bilateral trade reform contemplated by the Administration is designed to further the foreign policy of the United States. Accordingly, the contemplated import controls fall squarely within the statutory authorization of section 38.

We note that it could be argued that protecting public safety — the reason for limiting the importation of munitions into the United States — is a domestic, not a foreign policy concern. Even assuming that protecting public safety is viewed as exclusively a domestic issue, we do not believe this calls into question the President's authority under section 38 (as delegated to the Secretaries of Treasury and State) to control import of munitions. United States foreign policy usually includes as one component the promotion of domestic goals or the avoidance of a negative impact on domestic concerns in the process of pursuing a foreign policy objective. Taking into account the domestic effects of foreign policy does not change the fact that it is foreign policy that is being set. *See, e.g., Missouri v. Holland*, 252 U.S. 416 (1920) (President possesses authority to promote foreign policy through treaty power even where object affected is a local concern). Indeed, it would be artificial as well as practically impossible to separate the two. So, for example, in committing American troops to a peacekeeping action, the President may consider domestic concerns in defining the purpose and length of time of American involvement. Similarly, in the present context, existing controls on imports — which were imposed in furtherance of foreign policy — are being relaxed — again in furtherance of foreign policy. The extent to which the United States is willing to ease trade restrictions in pursuance of its foreign policy objectives is limited to ensure that it does not jeopardize public safety.

Courts, in affirming the broad grant of authority to the President under the AECA to control the export and import of firearms on foreign policy grounds, have advised that "statutes granting the President authority to act in matters touching on foreign affairs are to be broadly construed:"

> In the external sector of the national life, Congress does not ordinarily bind the President's hands so tightly that he cannot respond promptly to changing conditions or the fluctuating demands of foreign policy. Accordingly, when Congress uses far-reaching words in delegating authority to the President in the area of foreign relations, courts must assume, unless there is a specific contrary showing elsewhere in the statute or in the legislative history, that the legislators contemplate that the President may and will make full use of that power in any manner not inconsistent with the provisions or purposes of the Act. In a statute dealing with foreign affairs, a grant to the President which is expansive to the reader's eye should not be hemmed in or "cabined, cribbed, confined" by anxious judicial blinders.

*B-West Imports, Inc. v. United States*, 75 F.3d at 636 (quoting *South Puerto Rico Sugar Co. Trading Corp. v. United States*, 334 F.2d 622, 632 (Ct. Cl. 1964)); *see also Samora v. United States*, 406 F.2d 1095 (5th Cir. 1969). Finally, as the

court noted in *South Puerto Rico Sugar Co.* in sustaining the President's discretion to impose conditions on imports, Presidents acting under broad statutory grants of authority have "imposed and lifted embargoes, prohibited and allowed exports, suspended and resumed commercial intercourse with foreign countries" thereby reflecting "the historical authority of the President in the fields of foreign commerce and of importation into the country." 334 F.2d at 633, 634. The court specifically cautioned that "[i]t would be difficult, and probably unwise, to separate an executive choice in [the area of international economic relations] from the 'important, complicated, delicate and manifold problems' facing the President in the 'vast external realm.' " *Id.* at 630 (quoting *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936)). In determining how far to open United States markets to Russian arms manufacturers, the President is faced with just such a delicate confluence of factors that requires that United States foreign policy integrate international commercial policy with domestic policy concerns.

For these reasons, we conclude that restricting the import of Russian munitions to certain classes of firearms and ammunition is a legitimate use of the President's authority under the AECA as delegated to the Secretaries of Treasury and State.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*